36 F.3d 958
 63 USLW 2258, 1994-2 Trade Cases P 70,725
 SCFC ILC, INC., doing business as MountainWest Financial,
Inc., Plaintiff-Counter-Defendant-Appellee,
v.
VISA USA, INC., Defendant-Counter-Claimant-Appellant,
v.
SEARS, ROEBUCK AND COMPANY, an Illinois corporation; Sears
Consumer Financial Corporation an Illinois
corporation, Counterclaim-Defendants-Appellees.
American Bankers Association; Independent Bankers
Association of America; Colorado Bankers Association;
Community Bankers Association of Kansas; Community Bankers
Association of Oklahoma; Independent Bankers of Colorado;
Independent Community Bankers of New Mexico; New Mexico
Bankers Association; Kansas Bankers Association; Utah
Bankers Association; Wyoming Bankers Association; American
Automobile Manufacturers Association; Boulder Technology
Incubator; Chevron Corporation; Corning Incorporated;
Pacific Telesis Group; Plasticom Industries, Inc.; Rmes
Communications Inc.; American Financial Services
Association; Bankcard Holders of America, Amici Curiae.
 No. 93-4105.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 23, 1994.
 
 M. Laurence Popofsky (Stephen V. Bomse, Marie L. Fiala, Renata M. Sos, Robert G. Merritt, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Dale A. Kimball, Clark Waddoups, Heidi E.C. Leithead, Kimball, Parr, Waddoups, Brown & Gee, Salt Lake City, UT, with him on the briefs), Heller, Ehrman, White & McAuliffe, San Francisco, CA, for appellant Visa USA.
 William H. Pratt (Francis M. Holozubiec, Jason Klein, Kirkland & Ellis, New York City, James D. Sonda, Jeffrey S. Cashdan, Kirkland & Ellis, Chicago, IL; Kenneth W. Starr, Paul T. Cappuccio, Kirkland & Ellis, Washington, DC; Gary F. Bendinger, Giauque, Crockett & Bendinger, Salt Lake City, UT, with him on the briefs), Kirkland & Ellis, New York City, for appellee Mountainwest.
 Robert H. Bork, Washington, DC, on the brief for amicus curiae American Financial Services Ass'n.
 A. Douglas Melamed, Randolph D. Moss, Wilmer, Cutler & Pickering, Washington, DC; and Leonard J. Rubin, Bracewell & Patterson, Washington, DC, on the brief for amici curiae American Bankers Ass'n, etc.
 E. Thomas Sullivan, Tucson, AZ, on the brief for amicus curiae Bankcard Holders of America.
 Phillip Areeda, on the brief for amici curiae American Automobile Mfrs. Ass'n, etc.
 Before MOORE and SETH, Circuit Judges, and DAUGHERTY, District Judge.*
 JOHN P. MOORE, Circuit Judge.
 
 
 1
 Visa USA provides payment services to its 6,000 members which individually issue credit cards to consumers. Sears, Roebuck and Company, a competitor offering its own credit card, the Discover Card, wanted to become a Visa USA member and also issue Visa cards. The question presented by this case is whether Visa USA's refusal to admit Sears to its joint venture restrains trade in violation of section 1 of the Sherman Act, 15 U.S.C. Sec. 1. Rejecting Visa USA's legal and factual challenges to the jury's adverse verdict, the district court found the evidence of exclusion constituted antitrust injury and harm to competition. SCFC ILC, Inc. v. Visa U.S.A., Inc., 819 F.Supp. 956, 990 (D.Utah 1993). We conclude, however, the exclusion does not trigger section 1 liability and reverse.
 
 I. Background
 
 2
 As set forth more extensively in the district court's order, the factual background of this dispute encompasses the history of the general purpose credit card industry. What is known today "everywhere you want to be" as Visa has evolved over the last forty years from direct extensions of credit for a single purpose; for example, oil company or department store credit cards, to a "charge card which could be used for general purposes at a wide variety of retail establishments." Id. at 963 n. 2. The resulting card was offered without geographic restrictions under the neutral trademark, Visa.
 
 
 3
 Now, to its approximately 6,000 associates, Visa USA,[1] the umbrella organization, provides technology to process credit card transactions and regulates and coordinates the individual programs through rules and bylaws proposed by management and adopted by a board of directors (the Board).[2] The bylaws cover a range of issues: members' liability, termination, and confidentiality, to name a few. However, since its inception, each Visa USA member independently decides the terms and conditions of credit extensions, the number of cards issued, and the interest rates charged. That is, individual banks establish, operate, and promote their own credit card programs under the Visa aegis, while Visa USA serves as a clearinghouse for the ultimate transaction between issuer, consumer, and merchant. The fees members pay to Visa USA for its services vary according to a formula established by the association.
 
 
 4
 Any financial institution which is eligible for federal deposit insurance may become a Visa USA member. Among its current membership are Citicorp, Ford Motor Company, General Electric, and ITT. Although the membership was originally restricted to exclusively issuing Visa cards, a challenge to the bylaw prohibiting members from issuing MasterCard forced Visa USA to withdraw the rule. See Worthen Bank & Trust Co. v. National BankAmericard, Inc., 345 F.Supp. 1309 (E.D.Ark.1972), rev'd, 485 F.2d 119 (8th Cir.1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). Consequently, Visa USA members now generally offer both Visa and MasterCard, a practice referred to in the industry as duality.
 
 
 5
 Prior to its entry into the general credit card arena, Sears[3] mustered a bankcard steering committee to investigate the alternatives of developing its own general purpose charge card or joining the Visa USA/MasterCard association. In 1985, Sears introduced the Discover Card, its own proprietary card, one "owned and distributed solely by a single business entity," 819 F.Supp. at 963 n. 3., to be marketed and issued nationally. This entry was intended to compete with Visa, MasterCard, American Express, and Citibank's Diners' Club/Carte Blanche, the only other national proprietary cards. Despite Visa USA's aggressive efforts to thwart its new rival, id. at 963, Discover succeeded with such innovations as preapproved, no fee cards offering cash back bonuses to cardholders and deeper discounts to merchants. In fact, at the time of this litigation, Sears was the largest individual issuer of credit cards in terms of the number of cards distributed and the second largest, following Citicorp, in credit card receivables volume.[4] To compete with the Visa Gold Card and American Express Optima Card, Sears also introduced an upscale Discover Card called Prime Issue. Another Sears' entity, Sears Payment Services (SPS), assists other companies in operating their credit card programs.
 
 
 6
 In 1988, Greenwood Trust Company, a Sears-owned Delaware bank which issues Discover Card, applied for membership in Visa USA, prompting the Board to adopt the bylaw which is the genesis of this antitrust litigation. The amendment to the Board rule, Bylaw 2.06, stated:
 
 
 7
 Notwithstanding (a) above, if permitted by applicable law, the corporation shall not accept for membership any applicant which is issuing, directly or indirectly, Discover cards or American Express cards, or any other cards deemed competitive by the Board of Directors; an applicant shall be deemed to be issuing such cards if its parent, subsidiary or affiliate issues such cards.
 
 
 8
 Subsequently, the Board denied Greenwood Trust's application to Visa USA.
 
 
 9
 In 1990, the Resolution Trust Corporation sold Sears the assets, including the Visa USA membership, of MountainWest Savings and Loan Association, a bankrupt savings and loan in Sandy, Utah. Sears then created a new entity, SCFC ILC, Inc., doing business as MountainWest Financial, by merging the Sandy bank with Basin Loans, a Utah Industrial Loan Company.
 
 
 10
 Through this vehicle, Sears was poised to inaugurate a national Visa program it dubbed the Prime Option card, a charge card featuring a two-tiered interest rate, 9.9% for the first two months and 15.9% thereafter. To this end, Sears moved Discover's top executives to Prime Option and ordered an initial printing of 1.5 million Prime Option Visa cards. However, upon inadvertently discovering the plan, Visa USA cancelled the printing and invoked Bylaw 2.06 to exclude Sears from the association. Sears then instituted this antitrust litigation.II. Fed.R.Civ.P. 50(b) Review
 
 
 11
 In this appeal, Visa USA contends Sears has failed to carry its burden of showing Visa USA's conduct was harmful to competition in violation of section 1. Indeed, Visa USA underscores, the district court conceded had it tried the facts, it "would have concluded that the harm to competition from letting Sears into the Visa system is greater than any harm from keeping Sears out." 819 F.Supp. at 983. Sears, however, urges this fact-intensive case persuaded the jury that preventing consumers access to the Prime Option card and destroying rivals' incentives to develop new proprietary cards harmed competition.
 
 
 12
 Nonetheless, we focus only on those relevant antitrust facts, which, when viewed most favorably to Sears, underpin our plenary review under Fed.R.Civ.P. 50(b). In the context of this case, if there is evidence upon which a jury could properly find Visa USA restrained trade, we must affirm. 5A J. Moore & J. Lucas, Moore's Federal Practice p 50.07, at 50-76 (2d ed. 1994). Naturally, we do not weigh the credibility of the evidence when reviewing the record. However, if the evidence is insufficient "under the controlling law," Fed.R.Civ.P. 50(a), we must enter judgment as a matter of law for the moving party.
 
 
 13
 Having stated its contrary view, but reluctant to substitute its judgment for that of the jury, the district court articulated those facts which it opined could become the basis for judgment:
 
 
 14
 1. Testimony of Sears' expert, Professor James Kearl, on the appropriateness of calculating Visa USA's market power by aggregating the individual market shares of Visa USA and MasterCard; and his conclusion that Visa USA exercised market power through its collective power to make rules; and testimony about the "presence of high profits."
 
 
 15
 2. Dean Witter's president, Phillip Purcell's testimony had Sears known that developing the Discover Card would disqualify it from Visa USA entry, it would not have placed a new proprietary card in the market.
 
 
 16
 3. Testimony that no new proprietary cards had been introduced in the relevant market since Bylaw 2.06 was enacted although memberships in Visa USA and MasterCard increased.
 
 
 17
 4. Testimony that Prime Option "would be a low-cost card which would be supported by powerful marketing and advertising strategies on a national level." 819 F.Supp. at 986-87.
 
 
 18
 5. Testimony by Sears' executives that Discover Card, in the face of Prime Option's entry, would remain an aggressive competitor.
 
 
 19
 6. Testimony that intersystem competition will not be harmed "because Prime Option Visa was designed to reach that part of the market that Discover does not reach." Id. at 987.
 
 
 20
 7. Testimony that "Sears would benefit significantly from issuing Prime Option Visa as opposed to Prime Option Discover or another separate proprietary card." Id.
 
 
 21
 This evidence, which the district court found sufficient to impose section 1 liability, however, must be placed in the specialized province of antitrust law and section 1. We do so fully recognizing both the evolving legal precedent and the objectives of antitrust regulation: "to improve people's lives ... [through] economic efficiency ... more efficient production methods ... [and] through increased innovation." Stephen Breyer, The Cutting Edge of Antitrust: Lessons from Deregulation, 57 Antitrust L.J. 771 (1989). That antitrust objectives often collide with these goals simply reminds us "[a]ntitrust is an imperfect tool for the regulation of competition." Frank H. Easterbrook, The Limits of Antitrust, 63 Tex.L.Rev. 1, 39 (1984).
 
 III. Joint Ventures and Section I
 
 22
 Section 1 forbids agreements in restraint of trade.[5] Read costively, section 1 might prohibit "every conceivable contract or combination ... anywhere in the whole field of human activity." Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 60, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911). However, "the 'rule of reason' limits the Act's literal words by forbidding only those arrangements the anticompetitive consequences of which outweigh their legitimate business justifications." Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 486 (1st Cir.1988) (citing 7 P. Areeda & D. Turner Antitrust Law p 1500, at 362-63 (1978)), cert. denied, 488 U.S. 1007 (1989). Hence, when we ask if a particular practice is "reasonable" or "unreasonable," or if the practice is "anticompetitive," we use these terms with special antitrust meaning reflecting the "Act's basic objectives, the protection of a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods." Id. at 486. In this lexicon, a practice ultimately judged anticompetitive is one which harms competition, not a particular competitor. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 cert. denied, 429 U.S. 1090, 97 S.Ct. 1099, 51 L.Ed.2d 535 (1977); Brown Shoe Co. v. United States, 370 U.S. 294, 319-20, 82 S.Ct. 1502, 1521-21, 8 L.Ed.2d 510 (1962).
 
 
 23
 Of course, reasonability is of no consequence when certain practices, for example, price fixing, are entirely void of redeeming competitive rationales. These we deem per se illegal under section 1, no offsetting economic or efficiency justifications salvaging them. "This per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive." Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985).
 
 
 24
 The sharp line between per se and rule of reason analysis, however, especially blurs under section 1 when the actors change. In the case of a joint venture, present here in the Visa USA association, competitive incentives between independent firms are intentionally restrained and their functions and operations integrated to achieve efficiencies and increase output. See Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95 Harv.L.Rev. 1523, 1524 (1982). Although virtually any collaborative activity among business firms may be called a joint venture, joint ventures differ from mergers and cartels
 
 
 25
 by the extent to which they integrate the resources of their partners. A cartel constitutes a naked agreement among competitors unaccompanied by any integration of resources. In a joint venture, partners contribute assets, such as, capital, technology, or production facilities to a common endeavor. This integration of resources creates economic efficiencies that cannot be achieved by naked agreements among competitors. Indeed, the efficiencies created by joint ventures are similar to those resulting from mergers--risk-sharing, economies of scale, access to complementary resources and the elimination of duplication and waste. Joint ventures, however, differ from mergers in a critical way: because they are less integrated than mergers, they allow their partners to continue to compete with each other in the relevant market.
 
 
 26
 Thomas A. Piraino, Jr., Beyond Per Se, Rule of Reason or Merger Analysis: A New Antitrust Standard for Joint Ventures, 76 Minn.L.Rev. 1, 7 (1991) (italics added). The whole becomes greater than the sum of its parts. However, at its center remains an agreement among competitors to eliminate competition in some way.
 
 
 27
 The Supreme Court has recognized this tension in its evolving treatment of allegedly anticompetitive agreements by joint ventures. In Broadcast Music, Inc. v. Columbia Broadcasting, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (BMI), the Court refused to condemn under a per se analysis blanket licenses which amounted to price fixing among the participants. The joint venture, the American Society of Composers, Authors and Publishers (ASCAP), was created as a clearinghouse through which individual music copyright owners licensed their compositions, and ASCAP then monitored the use of their work. Virtually all participants in the copyright music market participated in ASCAP. However, eschewing per se treatment, the Court acknowledged, "Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." Id. at 23, 99 S.Ct. at 1564. Viewed in this light, the efficiency justification of increasing the aggregate output in the market rendered the agreement procompetitive.
 
 
 28
 Similarly, in NCAA v. Board of Regents of Univ. of Okla., 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), the Court held inappropriate the application of per se treatment to the NCAA's horizontal price fixing and output limitation of the number of games college football teams could negotiate to televise. Again the Court recognized the horizontal restraint on competition was essential to make the product available at all. Id. at 101, 104 S.Ct. at 2960. Under a rule of reason analysis, however, the rule decreased output and had the effect of increasing prices. While cooperation may be necessary and justified, the Court suggested it fit a different mold, such as, "rules defining the condition of the contest, the eligibility of participants, or the manner in which members of a joint enterprise shall share the responsibilities and the benefits of the total venture." Id. at 117, 104 S.Ct. at 2969.
 
 
 29
 Finally, in Northwest Wholesale Stationers, 472 U.S. at 284, 105 S.Ct. at 2613, the Court looked at the economic efficiency justifications of a joint purchasing cooperative to determine the anticompetitive effect of its expelling a member who did not comply with one of the cooperative's rules. Rejecting per se condemnation, the Court suggested the disclosure rule which excluded plaintiff from membership might be necessary to monitor the creditworthiness of the cooperative's members. "Wholesale purchasing cooperatives must establish and enforce reasonable rules in order to function effectively.... Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted." Id. at 296, 105 S.Ct. at 2620-21 (citations omitted).
 
 
 30
 In rejecting automatic per se treatment in these joint venture cases,[6] the Court directs us instead to look at the challenged agreement to judge whether it represents the essential reason for the competitors' cooperation or reflects a matter merely ancillary to the venture's operation; whether it has the effect of decreasing output; and whether it affects price. Underlying these cases is an effort to appreciate the economic reality of the particular business behavior to assure that the procompetitive goals, in fact, are neither undervalued nor mask a reduction in competition. Key to the analysis of "the competitive significance of the restraint," NCAA, 468 U.S. at 103, 104 S.Ct. at 2961 (quoting National Soc'y of Professional Eng'r v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978)), is the Court's appreciation that the horizontal restraint may be essential to create the product in the first instance. That understanding properly values the proprietary rights and incentives for innovation embodied by the joint venture as well as concerns about free-riding, "the diversion of value from a business rival's efforts without payment." Chicago Professional Sports Ltd. Partnership v. NBA, 961 F.2d 667, 675 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 409, 121 L.Ed.2d 334 (1992).
 
 
 31
 We do not read the Court's precedent involving joint ventures to imply any special treatment or differing antitrust analysis.[7] Indeed, aside from clarifying the inappropriateness of automatically invoking per se scrutiny of a joint venture's alleged antitrust violation, the Court has not articulated a different rule of reason approach. Thus, under the Court's precedent, cooperative business activity in one setting may permit its participants to achieve market efficiencies or economies of scale, while in another, a similar activity might run afoul under rule of reason review.
 
 
 32
 Again, in the context of section 1, the focus of the procompetitive justifications for the business practice remains the ultimate consumer. To be judged anticompetitive, the agreement must actually or potentially harm consumers. Stamatakis Indus., Inc. v. King, 965 F.2d 469 (7th Cir.1992). That concept cannot be overemphasized and is especially essential when a successful competitor alleges antitrust injury at the hands of a rival. Indeed, "[w]henever producers invoke the antitrust laws and consumers are silent, this inquiry becomes especially pressing." Chicago Professional Sports, 961 F.2d at 670.
 
 IV. Market Power
 
 33
 Rule of reason analysis first asks whether the offending competitor, here Visa USA, possesses market power in the relevant market where the alleged anticompetitive activity occurs. The answer to that question may end the suit or permit an abbreviated rule of reason inquiry.
 
 
 34
 Broadly, market power is the ability to raise price by restricting output.[8] "[I]n economic terms [it] is the ability to raise price without a total loss of sales." 2 P. Areeda & D. Turner, Antitrust Law p 501, at 322 (1978). Without market power, consumers shop around to find a rival offering a better deal. Indeed,
 
 
 35
 if we accept the notion that the point of antitrust is promoting consumer welfare, then it is clear why the concept of market power plays such a prominent role in antitrust analysis. If the structure of the market is such that there is little potential for consumers to be harmed, we need not be especially concerned with how firms behave because the presence of effective competition will provide a powerful antidote to any effort to exploit consumers.
 
 
 36
 George A. Hay, Market Power in Antitrust, 60 Antitrust L.J. 807, 808 (1992) [hereinafter Market Power ].
 
 
 37
 Consequently, whether a firm possesses market power may facilitate the determination that the practice harms competition and not simply a single competitor. Proof of market power, then, for many courts is a critical first step, or "screen," or "filter,"[9] which is often dispositive of the case. Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 666-67 (7th Cir.), cert. denied, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987). If market power is found, the court may then proceed under rule of reason analysis to assess the procompetitive justifications of the alleged anticompetitive conduct. National Bancard Corp. (NaBanco) v. VISA, U.S.A., 779 F.2d 592, 603 (11th Cir.), cert. denied, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).
 
 
 38
 While this approach is "the norm under Section 2 of the Sherman Act, where a firm cannot be found liable unless it has achieved monopoly power or there is a dangerous probability of its doing so," Market Power, at 808, this two-step analysis has become equally helpful under section 1.[10] See, e.g., Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C.Cir.1986), cert. denied, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987); Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325 (7th Cir.1986).
 
 
 39
 The market power query begins with the determination of the relevant market, "that is, a market relevant to the legal issue before the court." P. Areeda & H. Hovenkamp, Antitrust Law p 518.1c, at 535 (Supp.1993) [hereinafter 1993 Supplement ]. "The 'market' which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced--price, use and qualities considered." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). We also look to the geographic reach of the group of sales or sellers to determine the relevant market. Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510 (1962). Further, "[b]ecause the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes." Rothery Storage, 792 F.2d at 218.
 
 
 40
 To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area, while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price and volume.
 
 
 41
 Id. (quoting L. Sullivan, Antitrust Sec. 12, at 41 (1977)).
 
 
 42
 Although these concepts provide a shorthand for rule of reason analysis, we would be amiss to imply their application is necessarily facile. Each may be problematic:
 
 
 43
 There is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify--for working purposes--the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes. Further, when lawyers and judges take hold of the concept, they impose on it nuances and formulas that reflect administrative and antitrust policy goals. This adaption is legitimate (economists have no patent on the concept), but it means that normative and descriptive ideas become intertwined in the process of market definition.
 
 
 44
 United States Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 598 (1st Cir.1993). By defining the relevant market, however, we identify the firms that compete with each other. Plugged into the market power inquiry, we may then determine whether the alleged anticompetitive activity restrained trade, that is, raised price or reduced output.
 
 V. Issuer Market
 
 45
 This case illustrates both the utility and difficulties of the market power tool. In this lawsuit, Sears and Visa USA stipulated "the relevant market is the general purpose charge card market in the United States." 819 F.Supp. at 966. Presently, the only participants in this market are Visa USA, MasterCard, American Express, Citibank (Diners Club and Carte Blanche), and Sears (Discover Card). Competition among these five firms to place their individual credit cards into a consumer's pocket is called intersystem. "Interbrand competition is the competition among the manufacturers of the same generic product ... and is the primary concern of antitrust law." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977).
 
 
 46
 In its complaint, Sears alleged the amendment to Bylaw 2.06 represented a concerted refusal to deal which unreasonably restrained trade in the general purpose charge card market. The parties agreed, and the testimony clearly established that in this relevant market competition occurs only at the issuer level. That is, to the extent that Visa USA is in the market, it operates in the systems market, not the issuer market. Its members issue cards, competing with each other to offer better terms or more attractive features for their individual credit card programs. This is intrasystem competition.
 
 
 47
 The issuer market, thus, remains atomistic, each issuer financial institution, bank, or other entity being independent from another.[11] Although Sears does not dispute this characterization of the market, it contends it attempted to launch its Prime Option program under the Visa aegis to "compete more effectively" at the issuer level. By offering multiple credit cards, Discover and Prime Option Visa, Sears contended it would then "strengthen competition."
 
 
 48
 If the general credit card issuer market is the relevant market, however, the evidence the district court relied upon to deny the Rule 50(b) motion belies Sears' contention and calls into question the definition of relevant market the court apparently adopted. First, the district court recounted the market shares of each intersystem competitor: "Visa was estimated to possess 45.6% of the nationwide general purpose charge card market; MasterCard, 26.4%; American Express, 20.5%; Discover Card, 5.5%; and Diners Club, 2.0%." 819 F.Supp. at 966 (footnote omitted). Within Visa USA's intersystem share, aggregated to include MasterCard issuers as well, the district court noted the evidence showed "in 1991 the ten largest issuers of Visa and MasterCard accounted for approximately 48% of the total Visa/MasterCard charge volume. The top-ten issuers were Citicorp, First Chicago, AT & T, Chase Manhattan, MBNA America, Bank of America, Nationsbank, Chemical Bank, Banc One, and Wells Fargo Bank. The largest issuer, Citicorp, accounted for approximately $42.5 billion in charge volume in 1991--representing approximately 15.8% of the Visa/MasterCard market and 11.4% of the entire general purpose charge card market." Id. at 966 n. 8.
 
 
 49
 While these raw figures may suggest Visa USA possesses market power in the intersystem market, the parties have established a different paradigm. By their agreement, the context of this case was intended to focus on the issuance of credit cards as the relevant market. Indeed, that is the market the district court defined for the jury. To determine, therefore, whether Visa USA possesses market power, we must compare issuers, the point where both Sears and Visa USA agreed they compete. At that level, testimony from both Sears and Visa experts established Discover Card is the second largest issuer preceded only by Citicorp in terms of charge volume, that is, what consumers owe on their credit cards.
 
 
 50
 Based on the district court's figures, Citicorp's charge volume represented about 15.8% of the Visa/MasterCard market share, aggregated at 72% of the general purpose credit card market. If we compare issuers' charge volume, our calculations demonstrate Citicorp's is 21.9% in the relevant market, while that of Sears Discover Card is 5%. Neither figure reflects at the issuer level that Visa USA through its members possesses market power.
 
 
 51
 Nevertheless, Sears' expert, Dr. James Kearl, upon whom the district court relied to conclude the evidence was sufficient to establish Visa USA's market power, explained he looked at the collective, aggregated shares of Visa and MasterCard, because "we have a collective rule, bylaw 2.06 ... I found that the collective share was very large, and as a consequence my conclusion was that the collective rule was an exercise of market power." (italics added). Dr. Kearl opined the association members
 
 
 52
 have both incentive and the ability to exercise that market power. They have the incentive because this market share was large and they want to protect that market share. And they also had the incentive because since this is large, if they can keep prices up or from falling they can make a lot of money.
 
 
 53
 (italics added).
 
 
 54
 Second, despite the stipulation on the relevant market, "the market relevant to the legal issue before the court," 1993 Supplement, at 535, the testimony reflects that Sears, in fact, sought to expand its competition not specifically in the general purpose credit card market but in a segment of that market represented by financial institutions or banks. For example, Sears' executive, William O'Hara, stated, "We were trying to compete in that segment of the general purpose credit card market called the bank association segment." (emphasis added.) Visa USA's witness, Richard Rosenberg, explained he voted for Bylaw 2.06, believing that because a non-bank like Dean Witter did not have to comply with certain requirements imposed on banks like the Community Reinvestment Act, Sears would have a competitive advantage over its bank rivals.
 
 
 55
 Indeed, albeit the stipulation, as the trial progressed, the "relevant market" devolved into Visa USA's share of the defined market. Thus, the legal issue was transformed, equating exclusion from Visa USA to exclusion from the market.[12] The evidence, however, does not support this mutation. The district court recognized five active rivals presently compete at the intersystem level. Of that market, for example, Citicorp represents 21.9%, American Express 20.5%, and Sears 5%. At the issuer level, where intrasystem competition occurs, the court found, and the parties' experts agreed, the market is remarkably unconcentrated.[13] Given the wide range of interest rates and terms offered by various issuers and Sears' recognized intersystem strength, we are at a loss to find the evidence to support the district court's contrary conclusion.
 
 
 56
 From this standpoint, even if Visa USA possesses market power, Dr. Kearl's testimony that Visa USA exercised that market power in its ability to make collective rules misses the point in the context of joint ventures. "A joint venture made more efficient by ancillary restraints, is a fusion of the productive capacities of the members of the venture." Rothery Storage, 792 F.2d at 230. The very existence of a joint venture in the first instance is premised on a pooling of resources to affect competition in some manner and is made functional through some form of cooperative behavior or rule-making. However, the Court has made clear, as previously discussed, cooperative conduct alone is not prohibited.
 
 
 57
 Hence, it is not the rule-making per se that should be the focus of the market power analysis, but the effect of those rules--whether they increase price, decrease output, or otherwise capitalize on barriers to entry that potential rivals cannot overcome. Although Dr. Kearl testified "if they can keep prices up or from falling they can make a lot of money" to support his conclusion Visa USA possesses market power, there was no evidence that price had been increased, output had decreased, or other indicia of anticompetitive activity had occurred.
 
 
 58
 Thus, without any eye on effect, the very exercise of rule-making became the factual basis for rule of reason condemnation of Bylaw 2.06. Consequently, rule-making was not only divorced from its functional analysis but also from the facts of the case. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp., --- U.S. ----, ----, 113 S.Ct. 2578, 2598, 125 L.Ed.2d 168 (1993). In this complex area, the Court cautioned, "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." Id.
 
 
 59
 We believe the evidence cited by the district court to conclude Visa USA possessed market power is insufficient as a matter of law. Although the district court did not end its rule of reason inquiry upon that finding, the conclusion set the path for its uncharted journey upon a landscape of speculation, conjecture, and theoretical harm. The consequence is the finding of liability based on tendentious and conclusory statements, none of which amounts to evidence of restraint of trade.[14]
 
 VI. Efficiency Justifications
 
 60
 We therefore return to the two-step analysis previously discussed to assess the procompetitive justifications of Bylaw 2.06 to counteract Sears' allegation the restraint is unreasonable. Visa USA maintained it instituted Bylaw 2.06 to protect its property from intersystem competitors who otherwise would enjoy a free ride at this time of entry. Its general counsel, Bennett Katz, described technological advancements Visa USA achieved and incentives for innovation to system-wide competition generated. In a letter informing Sears of the Board's action, he stated, "As I indicated to you by phone, we believe that intersystem competition should be preserved and enhanced; membership by Greenwood Trust Co. would have the opposite effect." Describing the industry as small, "we only have three basic competitors ... Visa and MasterCard ... American Express and Discover," Katz expressed concern about government regulation if the existing competition diminished or Visa USA became too large.[15] In addition, there was testimony that after duality was permitted, MasterCard and Visa competed less aggressively, consumers regarding the two cards often as interchangeable. Other witnesses expressed concern, for example, about Sears' threat to their own profits; the effect a big player like Sears would have on the many small banks that compete in the Visa USA association; and Sears' likely ability to become a Board member and privy to confidential information.
 
 
 61
 Against these justifications, Sears offered testimony about a two-stage strategy in which it had always planned to enter the market first with its Discover Card and then with a low-cost Visa card; that marketing the Prime Option card as a Discover Card program would not meet the objectives of "Sears' branding strategy," and that consumers would be harmed by being denied the opportunity to select a Prime Option Visa card from the possible choices in the general charge card market. Broadly, Sears promised a low-cost, competitive alternative to the existing market's cards and elicited, through expert testimony, the prospect of other similarly situated potential intersystem competitors being excluded and discouraged from offering new rival cards because of Bylaw 2.06.
 
 
 62
 Most of this evidence relied upon by the district court is irrelevant to the central antitrust question posed, however. First, intent to harm a rival, protect and maximize profits, or "do all the business if they can," Ball Memorial Hosp., 784 F.2d at 1325, is neither actionable nor sanctioned by the antitrust laws. "Competition, which is always deliberate, has never been a tort, intentional or otherwise." Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 379 (7th Cir.1986), cert. denied, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987). "Most businessmen don't like their competitors or for that matter competition. They want to make as much money as possible and getting a monopoly is one way of making a lot of money." Id. Thus, evidence that a Board member voted for Bylaw 2.06 to discourage price competition within Visa USA may reveal a mental state but is not an objective basis upon which section 1 liability may be found. If Bylaw 2.06 is not "objectively anticompetitive the fact that it was motivated by hostility to competitors ... is irrelevant." Id. (citation omitted).
 
 
 63
 What we ask under section 1 is whether the alleged restraint is reasonably related to Visa USA's operation and no broader than necessary to effectuate the association's business. NaBanco, 779 F.2d at 592, 601. That is, is Bylaw 2.06 ancillary, "subordinate and collateral ... [making] the main transaction more effective in accomplishing its purpose," which is to provide credit card services to its members? Rothery Storage, 792 F.2d at 224. If it is not ancillary, does it restrain trade in a manner which alters the structure of the general purpose credit card market and, thus, harms consumers?
 
 
 64
 We think the analysis in Rothery Storage helps us resolve this question. There, Atlas Van Lines adopted a new policy to prohibit any affiliated company from handling interstate hauling both under its own name as well as under the Atlas name. The policy was intended to prevent its affiliates from using Atlas equipment, facilities, and services for interstate hauling while independently negotiating contracts for their own accounts.[16] Atlas announced the rule was necessary to prevent its agents from benefiting from a free ride, increasing Atlas' liability for interstate shipments while using Atlas' resources without any attendant return of revenue.
 
 
 65
 Atlas has required that any moving company doing business as its agent must not conduct independent interstate carrier operations. Thus, a carrier agent, in order to continue as an Atlas agent, must either abandon its independent interstate authority and operate only under Atlas' authority or create a new corporation (a 'carrier affiliate') to conduct interstate carriage separate from its operation as an Atlas agent. Atlas' agents may deal only with Atlas or other Atlas agents.
 
 
 66
 Id. at 217.[17] Several Atlas carrier agents claimed the policy constituted a group boycott and filed a complaint under section 1.
 
 
 67
 After a thorough and well-reasoned analysis, the D.C. Circuit rejected plaintiffs' claim, based not simply on the evidence Atlas did not possess market power in the market for the interstate carriage of used household goods, but also on the conclusion the new rule was ancillary to Atlas' main enterprise, enhancing consumer welfare by creating efficiency. Id. at 223. What improved the company's efficiency, the court found, was the elimination of the free ride:
 
 
 68
 The restraints preserve the efficiencies of the nationwide van line by eliminating the problem of the free ride. There is, on the other hand, no possibility that the restraints can suppress market competition and so decrease output.
 
 
 69
 Id. at 229. This conclusion was built on the foundation of BMI, NCAA, and Northwest Wholesale Stationers.
 
 
 70
 Similarly, Visa USA urges its concern about protecting the property it has created over the years and preventing Sears and American Express,[18] successful rivals, from profiting by a free ride does not represent a refusal to deal or group boycott but is reasonably necessary to ensure the effective operation of its credit card services. It urges Bylaw 2.06 avoids "free-riding, an unlevel playing field, and the added costs that Sears would impose on VISA members by taking advantage of a brand and operating systems that it not only had done nothing to create but had chosen to compete against." Visa USA contends Sears does not need Visa USA to compete in the relevant market and cannot demonstrate it can only issue a low-cost card with Visa USA's help.
 
 
 71
 Sears urges the justification is pretext. "In this case, the issue is whether the selective exclusion imposed by Visa's Bylaw 2.06 is ancillary to Visa's legitimate purposes as an open industry association." Sears contends Visa USA is a network joint venture, one whose integrative efficiencies actually grow as its membership increases. To accept Visa USA's analogy to a research venture, one expending individual talent and resources in a small laboratory only to be forced to include rival researchers, Sears argues, is naive. It protests everyone gets into Visa USA except Sears itself. In support, Sears relies on the bulwarks of exclusionary conduct cases.
 
 
 72
 We do not believe either precedent or policy compels Sears' position, however. For example, United States v. Terminal R.R. Ass'n of St. Louis, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912) (joint venture railroad companies that acquired Terminal Company, which controlled bridge across Mississippi River, approaches, and terminal at St. Louis, must admit rivals to permit use of facilities on nondiscriminatory terms), involved a "most extraordinary" situation in St. Louis, "and we base our conclusion in this case, in a large measure, upon that fact." Id. at 405, 32 S.Ct. at 513-14. In that setting, mandating the combined railroad companies admit their competitors merely permitted joint ownership of common facilities. "The defendants had not built or created anything except a combination to take over existing facilities." 1993 Supplement p 736.1, at 841.
 
 
 73
 Similarly, Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (joint venture news gathering agency must provide reasonable access to excluded firms), never stated a joint venture cannot exclude anyone. The Court's prohibition of the membership restriction was focussed particularly on the operation of the rule itself, where an individual Associated Press member could singly veto a rival's access to its local market. More importantly, the joint venture, "the largest news agency," was factually unique: its news gathering and dissemination capacity could not be duplicated and represented in and of itself a limitation on nonmembers. Id. at 13, 65 S.Ct. at 1421.[19]
 
 
 74
 We would also distinguish the much-quoted language in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (ski company's decision not to participate in an all-mountain lift ticket violated section 2). In that case, defendant ski company justified its refusal to continue offering an all-mountain lift ticket by asserting it had no duty to engage in joint marketing with a competitor. The Court responded by observing:
 
 
 75
 The absence of a duty to transact business with another firm is, in some respects, merely the counterpart of the independent businessman's cherished right to select his customers and his associates. The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified.
 
 
 76
 Id. at 601, 105 S.Ct. at 2856 (footnote omitted). In qualifying that right, the Court noted in the context of section 2 the refusal to deal had the effect of making "an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years ... Ski Co.'s decision to terminate the all-Aspen ticket was thus a decision by a monopolist to make an important change in the character of the market." Id. at 603-04, 105 S.Ct. at 2858.
 
 
 77
 None of these conditions is present in this case. Bylaw 2.06 did not alter the character of the general purpose credit card market or change any present pattern of distribution. Id. Nor did it bar Sears from access to this market. There was no evidence Sears could only introduce a Prime Option card with Visa USA's help or that Visa USA's exclusion from its joint venture disabled Sears from developing its new card under the Discover mantle. More importantly, there was no evidence the bylaw harms consumers, the focus of the alleged violation. Indeed, the evidence established the current market in general purpose credit cards is structurally competitive, issuers targeting different consumer groups and consumer needs. In this market, Sears already competes vigorously. Surely, if its goal is to compete more effectively in that market, we do not believe this objective constitutes the proverbial sparrow the Sherman Act protects. "[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." Stamatakis Indus., 965 F.2d at 471.[20]
 
 
 78
 Given Visa USA's justification the bylaw is necessary to prevent free-riding in a market in which there was no evidence price was raised or output decreased or Sears needed Visa USA to develop the new card, we are left with a vast sea of commercial policy into which Sears would have us wade. To impose liability on Visa USA for refusing to admit Sears or revise the bylaw to open its membership to intersystem rivals, we think, sucks the judiciary into an economic riptide of contrived market forces. Whatever currents Sears imagines Visa USA has wrongly created, we believe can be better corrected by the marketplace itself. The Sherman Act ultimately must protect competition, not a competitor, and were we tempted to collapse the distinction, we would distort its continuing viability to safeguard consumer welfare.
 
 VII. Conclusion
 
 79
 Reversal of the district court's order denying Visa USA's Rule 50(b) motion further dissipates the preemptive strike Visa USA attempted by requesting injunctive relief under section 7 of the Clayton Act. The reasoning which underpins our reversal of the district court's order and leaves the present entities in the market unchanged obviates scrutiny under section 7 of the Clayton Act. The district court properly denied relief.
 
 
 80
 We therefore REVERSE the district court's order holding Visa USA liable under section 1 of the Sherman Act. However, we AFFIRM its denial of an injunction to Visa USA under section 7 of the Clayton Act for reasons consistent with this opinion.
 
 
 
 *
 Honorable Frederick A. Daugherty, Senior District Judge for the United States District Court for the Western District of Oklahoma, sitting by designation
 
 
 [1]
 In this opinion, Visa USA designates the joint venture named as the defendant. We refer to its credit cards simply as Visa
 
 
 [2]
 The Visa USA Board draws its members from twelve designated regions, each electing a representative, generally a bank's chief executive officer or chief operating officer. Based on a formula, larger regions may have a second board seat. Seven directors are elected nationally, and a separate seat is reserved for a director who represents small banks. Citicorp has its own seat on the board based on the rule of automatic appointment to any member with more than ten percent of the total volume of outstanding cards. MasterCard board members are not permitted to sit on the Visa USA board
 
 
 [3]
 Sears, Roebuck and Company is the parent corporation of Sears Consumer Financial Corporation and Dean Witter Financial Services Group, its wholly owned subsidiaries. Sears' counsel informed the court during oral argument that Dean Witter then owned plaintiff MountainWest. However, the designation Sears in this opinion collectivizes plaintiff bank and the Sears entities involved in the litigation
 
 
 [4]
 In 1991, approximately 24 million Discover cards had been issued, while Citicorp had approximately 21 million cards in the market
 
 
 [5]
 In part, section 1 states, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."
 
 
 [6]
 BMI, NCAA, and Northwest Wholesale Stationers are emblematic and not intended to be all inclusive or exhaustive of the extant Supreme Court precedent on joint ventures under section 1
 
 
 [7]
 We would note, however, some of the commentary on the antitrust treatment of joint ventures suggests a different approach. See, e.g., Thomas A. Piraino, Jr., Beyond Per Se, Rule of Reason or Analysis: A New Antitrust Standard for Joint Ventures, 76 Minn.L.Rev. 1 (1992); Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95 Harv.L.Rev. 1523 (1982)
 
 
 [8]
 The 1984 Department of Justice Merger Guidelines define market power as "[t]he ability of one or more firms profitably to maintain prices above a competitive level for a significant period of time." U.S. Dept. of Justice Merger Guidelines (1984), reprinted in 4 Trade Reg. Rep. (CCH) p 13,103 at 20,556
 
 
 [9]
 These screens or filters are presumptions in antitrust analysis. They "help to screen out cases in which the risk of loss to consumers and the economy is sufficiently small that there is no need of extended inquiry and significant risk that inquiry would lead to wrongful condemnation or to the deterrence of competitive activity as firms try to steer clear of the danger zone." Frank H. Easterbrook, The Limits of Antitrust, 63 Tex.L.Rev. 1, 17 (1984). These "simple rules [ ] will filter the category of probably-beneficial practices out of the legal system, leaving to assessment under the Rule of Reason only those with significant risks of competitive injury." Id
 
 
 [10]
 Again, we recognize the overlaps in analysis between section 1 and section 2 cases as did the district court. Nevertheless, the differences must be underscored, the former involving conduct that doesn't alter market structure; the latter, "a pernicious market structure in which the concentration of power saps the salubrious influence of competition." Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 272 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)
 
 
 [11]
 Although approximately 6,000 financial institutions separately are issuers in the association, setting fees, interest rates, and other conditions, approximately 19,000 "participating members" offer cards under their own names and utilize the services of their issuing bank. Robert E. Litan, Consumers, Competition, and Choice, The Impact of Price Controls on the Credit Card Industry, March 1992
 
 
 [12]
 This revision of the market distinguishes this case from Reazin v. Blue Cross & Blue Shield of Kan., 899 F.2d 951 (10th Cir.), cert. denied, 497 U.S. 1005, 110 S.Ct. 3241, 111 L.Ed.2d 752 (1990), upon which Sears relies
 
 
 [13]
 Ironically, the district court rejected Visa USA's argument that the present market is highly concentrated, such that admitting Sears would constitute a violation of section 7 of the Clayton Act. After discussing the Herfindahl-Hirschman Index (HHI), which is used to determine market concentration, the district court rejected Visa USA's aggregation of market shares, stating "the court agrees with Visa's expert Professor Schmalensee that each individual issuer of Visa and MasterCard cards should be included in the HHI analysis, resulting in a system HHI of below 500." SCFC ILC, Inc. v. Visa U.S.A., Inc., 819 F.Supp. 956, 994 (D.Utah 1993). This figure represents an unconcentrated market
 
 
 [14]
 In particular, Sears' disincentive argument provides the widest array of speculation and raises concerns about its standing to represent the supposed injury of others hoping to start up proprietary charge cards. Nevertheless, the parties each shared in charting the court's terrain
 
 
 [15]
 In testimony, Katz explained, not only was Justice Department scrutiny a concern, but also "attorneys general around the country who had been looking at Visa and deciding whether it is too large."
 
 
 [16]
 The new policy responded as well to deregulation of the moving industry. Although regulatory constraints figured in the analysis, the resolution of the central issue was not dependent on that context
 
 
 [17]
 That is, its interstate rivals can no longer compete in interstate hauling both as Atlas agents and as independent agents. The policy, then, is analogous to the rule at issue here
 
 
 [18]
 We note that American Express has never participated in this lawsuit
 
 
 [19]
 Terminal Railroad and Associated Press are the roots of the essential facility analysis in antitrust. See Phillip E. Areeda, Essential Facilities: An Epithet in Need of Limiting Principles, 58 Antitrust L.J. 841 (1990)
 
 
 [20]
 Indeed, when the question becomes whether the restraint is reasonably necessary to achieve the joint venture's goals, "[e]xclusivity of venture membership will not generally be regarded as suspect." 1993 Supplement p 1506, at 1115. The Department of Justice has stated:
 [S]electivity in the membership of a joint venture often enhances a joint venture's procompetitive potential. Forcing joint ventures to open membership to all competitors (or to license the product of an R & D joint venture to all who seek licenses) would decrease the incentives to form joint ventures ... For example, the inability to exclude those who would bring little or nothing to the joint venture, or those who would fail to share fully in the risks, would decrease the efficiency of the joint venture and reduce the expected reward from successfully accomplishing the joint venture's mission. An enforcement policy that denied a joint venture the ability to select its members might also encourage firms to forego risky endeavors in the hope of being able to gain access through antitrust litigation to the fruits of the successful endeavors of others. Thus, the Department [of Justice] generally will be concerned about a joint venture's policy of excluding others only if (i) an excluded firm cannot compete in a related market or markets ... in which the joint venture members are currently exercising market power without having access to the joint venture and (ii) there is no reasonable basis related to the efficient operation of the joint venture for excluding other firms.
 Justice Department, International Operations Antitrust Enforcement Policy 42 (Nov. 10, 1988) (CCH Supp.) (quoted in 1993 Supplement p 1506, at 1115).