**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1278**

IT'S MY PARTY, INC.; IT'S MY AMPHITHEATRE, INC., d/b/a
Merriweather Post Pavilion,

                    Plaintiffs - Appellants,

          v.

LIVE NATION, INC.,

                    Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   J. Frederick Motz, Senior District
Judge.   (1:09-cv-00547-JFM)

Argued:  December 8, 2015          Decided:  February 4, 2016

Before WILKINSON, NIEMEYER, and DIAZ, Circuit Judges.

Affirmed by published opinion.   Judge Wilkinson wrote the
opinion, in which Judge Niemeyer and Judge Diaz joined.

**ARGUED**: Robert William Hayes, COZEN O'CONNOR, Philadelphia,
Pennsylvania, for Appellants.   Jonathan M. Jacobson, WILSON
SONSINI GOODRICH & ROSATI, New York, New York, for Appellee. **ON
BRIEF**: Abby L. Sacunas, Philadelphia, Pennsylvania, L. Barrett
Boss, COZEN O'CONNOR, Washington, D.C., for Appellants.   Chul
Pak, Lucy Yen, Kimberley Piro, WILSON SONSINI GOODRICH & ROSATI,
New York, New York, for Appellee.

WILKINSON, Circuit Judge:

Plaintiff It's My Party, Inc. (IMP) contends that defendant Live Nation, Inc. (LN) has violated the Sherman Antitrust Act by engaging in monopolization, tying arrangements, and exclusive dealing in the music concert industry. The district court granted summary judgment to defendant LN. Because plaintiff has failed to define the relevant markets or to demonstrate any anticompetitive conduct, we affirm.

I.

A.

IMP and LN are competitors in the live music industry. Both promote concert tours and operate concert venues, but they differ in geographic reach. Plaintiff IMP is a regional player that promotes concerts and works with venues in the Washington, DC and Baltimore, MD area. Defendant LN is a national promoter that provides services to artists throughout the country. It owns, leases, or holds exclusive booking rights at venues across the United States. LN has expanded over time by acquiring other concert promoters as well as Ticketmaster, a major ticket sales and distribution company.

In addition to promoting concerts, IMP and LN both operate outdoor amphitheaters. IMP manages and operates Merriweather Post Pavilion in Columbia, Maryland, and LN owns Nissan Pavilion (now called Jiffy Lube Live) in Bristow, Virginia. Merriweather

2

has a seating capacity of roughly 19,000 with 5,000 fixed seats, while Nissan has a capacity for 25,000 with 10,000 fixed seats. Concert venues range in size from small clubs with a capacity of about 1,000 to sports stadiums seating over 60,000.

Artists select venues based on their capacity, revenue potential, and the option of playing outdoors. The Washington-Baltimore area has a number of concert venues other than Merriweather and Nissan. Among the other venues are the Filene Center at Wolf Trap (7,000 person amphitheater), the First Mariner Arena (14,000 person arena), the Patriot Center (10,000 person arena), the Pier Six Pavilion (4,200 person amphitheater), and the Verizon Center (19,000 person arena). J.A. 1516. Notwithstanding the abundance of options, Merriweather has more than held its own. Between 2006 and 2012, it hosted an impressive line-up of prominent artists, including Bob Dylan, John Legend, Maroon 5, Nickelback, Nine Inch Nails, Sheryl Crow, Taylor Swift, The Black Eyed Peas, and The Fray. J.A. 827-40.

The basics of the music concert industry are easily described. IMP and LN compete for the business of artists, vying to promote their concerts and showcase them in their venues. Promoters, in negotiation with artists, work on financing concerts, arranging dates and locations, securing venues, and advertising. In terms of compensation, the artist typically

3

receives either a minimum guaranteed payment or an agreed-upon percentage of the gross ticket sales.

Artists have two main options for organizing the individual concerts that make up their tours. One approach is to use a different local promoter for each location and secure venues through the promoters. Alternatively, an artist can work with a national promoter such as LN for most or all of the tour. The two options frequently offer different modes of compensation. "Artists who contract with one or a few national promoters to organize their tours often receive a guaranteed payment from the promoter based on the number of shows organized by that promoter. Artists who contract 'locally' and book with several promoters in various parts of the country will often receive instead a percentage of the gross ticket sales from each concert." It's My Party, Inc. v. Live Nat., Inc., 88 F. Supp. 3d 475, 481 (D. Md. 2015).

B.

IMP was dissatisfied with the workings of the industry as described above. Plaintiff brought suit on March 5, 2009, alleging that LN had violated § 1 and § 2 of the Sherman Act and parallel Maryland antitrust law through monopolization, tying arrangements, and exclusive dealing. The result of LN's conduct, claims IMP, was the foreclosure of competition in the concert promotion and venue markets. The district court denied LN's

4

motion to dismiss in July 2009 and an initial motion for summary judgment without prejudice in August 2012. Following briefing and argument, the court granted summary judgment in LN's favor in February 2015.

In a careful opinion, the district court declined to adopt IMP's definition of the promotion market and excluded the portion of its expert analysis defining the venue market. It's My Party, 88 F. Supp. 3d at 485-88, 490-92. The trial court also found insufficient evidence that LN had engaged in monopolization, tying, or any other anticompetitive behavior. Plaintiff's state law claims were deemed to fall in tandem with its federal ones. IMP now appeals.

Our standard of review is well settled. Summary judgment is justified if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing a motion for summary judgment, the court must 'draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion.'" Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 817 (4th Cir. 1995) (quoting Tuck v. Henkel Corp., 973 F.2d 371, 374 (4th Cir. 1992) (citation omitted)).

## II.

Plaintiff faces here the initial challenge of identifying exactly what market defendant is accused of monopolizing.

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455-56 (1993) (discussing the definition of a relevant market as a threshold issue for monopolization claims under § 2); Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 464 (1992) (treating "appreciable economic power in the tying market" as a "necessary feature of an illegal tying arrangement"). In the absence of a plausible market definition, courts are hard pressed to discern the nature or extent of any anticompetitive injury that plaintiff and other similarly situated parties may be suffering.

This case involves two separate but related markets: the market for concert promotion and the market for concert venues. In both, the relevant consumers are performing artists, who contract with promoters and venues to put on concerts. In its market definition analysis, IMP characterized the promotion market as national rather than local and restricted the venue market to major amphitheaters to the exclusion of other venues. As the district court recognized, these definitions were plainly designed to bolster IMP's monopolization and tying claims by artificially exaggerating LN's market power and shrinking the scope of artists' choices.

A.

To support its claims that LN was monopolizing the concert promotion market and tying promotion services to its venues, IMP had to first define the promotion market and demonstrate LN's

6

market power therein. According to IMP, promoters compete nationally for contracts to promote performances anywhere in the country. By defining the market as national, IMP could more easily construe LN's nationwide network of promoters and venues as evidence of market power. In contrast, IMP could portray itself as a modest regional outfit whose resources pale in comparison. If instead the market were defined locally and narrowed to just the Washington-Baltimore area, then IMP would appear more evenly matched against LN's regional capacity. Unfortunately for plaintiff, its market definitions are blind to the basic economics of concert promotion.

The relevant geographic market in antitrust cases is defined by the "area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 441 (4th Cir. 2011). Applied to this case, that inquiry focuses on the area within which artists can find alternative promoters if any one promoter were to increase its prices. The goal of concert promotion is of course to boost ticket sales. Therefore, artists' demand for promotion services is derivative of the public's demand for concert performances. Concertgoers will typically not travel out of their region to attend a concert in response to higher ticket prices in their area. Heerwagen v. Clear Channel Commc'ns, 435

7

F.3d 219, 228 (2d Cir. 2006). Because the demand for concerts is local, promoters need to target their advertising to the area surrounding a particular venue. As the district court found in reviewing the record, "promoting shows is highly localized, and . . . most promoters promote in specific locations." It's My Party, 88 F. Supp. 3d at 492. "For example, Live Nation books the majority of its television advertising locally, with only about five percent spent on national advertising." Id. at 491.

These market dynamics favor promoters familiar with local media outlets and the local audience. An artist is unlikely to switch to a promoter based in Miami simply because a Baltimore promoter demands a bigger cut of the ticket sale proceeds. IMP sidesteps this point by focusing on the feasibility of promoting concerts from anywhere using modern technology. That technological capacity is useless, however, without the relevant local knowledge and local contacts. Indeed, IMP itself must be aware of that reality since it does not attempt to promote beyond its Washington-Baltimore base. Even a national promoter like LN is almost exclusively focused on local advertising and operates its promotion services through regional offices rather than a central hub. J.A. 2427. The ability of national promoters to coordinate cross-country tours does not change the fact that they provide services and compete for business on a local basis. Heerwagen, 435 F.3d at 230. In short then, the market for

8

concert promotion is local, and the relevant competition in this case is between IMP and LN for the Washington-Baltimore area. The battle, in other words, is on IMP's own turf.

B.

IMP's definition of the venue market is similarly defective. It first confined the market to "major amphitheaters," large outdoor spaces suitable only for popular artists, while excluding clubs, arenas, stadiums, and other venues. Not content with that narrow definition of the venue market, IMP further specified that the amphitheaters must have a capacity of 8,000 or more, actually sell 8,000 or more tickets, and be in use only from May to September. Only two venues in the entire Washington-Baltimore area meet IMP's specifications -- the very two venues featured in this case, Merriweather and Nissan. IMP's approach is akin to defining a market to include tennis players who have won more than three Olympic gold medals and finding that only Venus and Serena Williams fit the bill.

This exercise in precise line-drawing "suits the needs of plaintiffs," as the district court observed. It's My Party, 88 F. Supp. 3d at 488. LN's market power appears magnified when the relevant market contains only two competitors, and any business taken away from Merriweather seems to flow directly to Nissan. But in its haste to stage this one-on-one showdown, IMP again casts sound economics aside.

9

Whether a product, in this case amphitheaters, commands a distinct market depends on whether it is "reasonably interchangeable," United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956), with other products or the "extent to which consumers will change their consumption of one product in response to a price change in another, i.e., the 'cross-elasticity of demand.'" Eastman Kodak Co., 504 U.S. at 469 (citations omitted) (quoting E.I. du Pont de Nemours & Co., 351 U.S. at 400). Here, IMP has not pointed to any record evidence demonstrating that artists are so likely to stick to amphitheaters in the event of a price increase that amphitheaters comprise their own market. Artists who prefer amphitheaters may nonetheless turn to a lower-priced substitute, which, after all, allows the show to go on. There is therefore an insufficient basis for excluding "reasonably interchangeable" venues such as similarly sized arenas or stadiums from the market definition.

Plaintiff has simply not carried its burden of showing that amphitheaters are the only place certain artists are willing to perform, irrespective of the monetary or logistical advantages of other concert locations. As the district court noted, "artists regularly perform at both amphitheaters and non-amphitheaters," and any "artist dissatisfied with Live Nation's conditioning of amphitheaters could simply perform at another

10

venue." It's My Party, 88 F. Supp. 3d at 497. IMP's key evidence supporting its venue market definition -- a statistical analysis that purportedly shows that some artists prefer either amphitheaters or arenas -- fails to adequately consider cross-elasticity of demand between the two types of venues. IMP's reliance on this evidence is akin to claiming that Pepsi and Coke are in different markets because consumers generally prefer one or the other. Mere consumer preference does not indicate what Pepsi enthusiasts would do in response to an increase in its price. Similarly, a particular artist's preference for amphitheaters or arenas does not reveal what the artist would do if the cost of performing in an amphitheater began to rise.

In defending its market definition, IMP chides the district court for rigorously challenging its expert's analysis. But that court was not required to accept uncritically two market definitions -- a sweeping national promotion market and a cramped amphitheater-only venue market -- that coincidentally fit plaintiff's precise circumstances. No party can expect to gerrymander its way to an antitrust victory without due regard for market realities. See E.I. du Pont de Nemours & Co., 637 F.3d at 442.

## III.

Lacking sound market definitions, IMP's monopolization and tying claims are left in a weakened state. Even assuming the

11

plausibility of those definitions, however, plaintiff's allegations of anticompetitive conduct fail of their own accord. The bulk of IMP's case hinges on two closely related tying claims. First, plaintiff argues that artists who hire LN for its promotion services are compelled to perform at its Nissan venue. Second, LN allegedly will give artists access to its amphitheaters in other locations only if they choose Nissan for their Washington-Baltimore date. In these two claims, the tying products used to lure artists are promotion services and amphitheaters in other areas, whereas the tied product forced upon artists in both instances is Nissan. We will address the venue-to-promotion and venue-to-venue tying claims in that order.

## A.

A tying arrangement is "defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958). Tying suppresses competition in two ways: "First, the buyer is prevented from seeking alternative sources of supply for the tied product; second, competing suppliers of the tied product are foreclosed from that part of the market which is subject to the tying arrangement." Advance Bus. Sys. & Supply Co. v. SCM Corp., 415 F.2d 55, 60 (4th Cir. 1969).

12

What causes these anticompetitive harms and distinguishes tying from ordinary market behavior is not the mere bundling of two products together but rather the <u>coercion</u> of the consumer. As the Supreme Court put it, the crux of tying lies in "the seller's exploitation of its control over the tying product to <u>force</u> the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." <u>Jefferson Parish Hosp. Dist. No. 2 v. Hyde</u>, 466 U.S. 2, 12 (1984), <u>abrogated on other grounds by</u> <u>Ill. Tool Works Inc. v. Indep. Ink, Inc.</u>, 547 U.S. 28 (2006) (emphasis added); <u>accord</u> Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law: An Analysis of Antitrust Principles and Their Applications</u> ¶ 1700i (3d ed. 1995) (deducing from longstanding case law that "no tie exists unless the customer was 'coerced' into taking both products"). If instead the buyer is free to decline the tied product or to purchase the two products separately, then by definition there is no unlawful tying. <u>See</u> <u>Times-Picayune Pub. Co. v. United States</u>, 345 U.S. 594, 614 (1953) (stressing the importance of a "forced purchase"); <u>Stephen Jay Photography, Ltd. v. Olan Mills, Inc.</u>, 903 F.2d 988, 991 (4th Cir. 1990) (same). That is precisely the case here.

While paying lip service to the tying case law, IMP proceeds to strip the doctrine of its core element of coercion.

13

By its proffered definition, IMP argues that tying occurs any time a seller who has market power over product A offers it for sale together with product B. But merely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive. Otherwise, the seller would be guilty of anticompetitive conduct even if buyers in fact preferred and freely chose to buy product A and product B together and competitors were not foreclosed from selling alternatives to product B. Without the element of coercion, IMP's version of tying targets none of the anticompetitive harms animating the doctrine. Advanced Bus. Sys. & Supply Co., 415 F.2d at 60 (outlining the harms to competitors and consumers). Without coercion -- i.e., without requiring the customer to buy product B when buying product A -- selling products A and B as a unit is simply one strategy for gaining an edge in a free marketplace. To allow tying doctrine to swell to the point of prohibiting such legitimate means of competition would make antitrust law its own worst enemy.

B.

A review of the facts in this case reveals IMP's reason for excising coercion from tying doctrine: plaintiff has no prospect of satisfying that element here. The record contains little basis for concluding that artists were coerced into taking the tied product, performances at Nissan, with the tying product,

LN's promotion services. IMP cherry-picks excerpts of LN's communications, mostly internal emails, that discuss its negotiations with artists over concert tours and the Nissan venue. In no instance, however, did LN convey that an artist could not receive its promotion services unless it appeared at Nissan. In fact, several agents specifically denied being forced to put their artists in LN venues as part of their agreements with LN. J.A. 6556-57, 6580-82. In response, IMP conjectures that the "agents shaded their testimony for an entity who dictates whether their clients 'work.'" Appellant's Br. at 44-45. But if pure speculation by a competitor were enough to prove the opposite of what consumers describe is happening in the market, then antitrust defendants should surrender every time a rival files a complaint.

There is, moreover, ample evidence suggesting the exact opposite of what IMP seeks to prove, namely the absence of coercion and tying. Plaintiff's own analysis reveals that the tying product was sometimes sold without the tied product. Artists on LN-promoted national tours, the very artists who were supposedly strong-armed into performing at Nissan, in fact chose IMP-owned Merriweather fourteen percent of the time. J.A. 4630-31. Ten percent has been cited as the minimum benchmark for separate sales sufficient to rebut any inference of tying. 10 Areeda & Hovenkamp, supra, at 328, ¶ 1756b2. Without adopting

15

that particular figure as the definitive baseline, we note that non-tied sales in this case exceed it sufficiently to cast doubt on any allegation of tying.

Even without direct evidence, a plaintiff could still prove coercion circumstantially. See Serv. & Training, Inc. v. Data Gen. Corp., 963 F.2d 680, 688 (4th Cir. 1992). Here, IMP relies on a regression analysis purporting to show that artists on national tours promoted by LN disproportionately perform at Nissan rather than Merriweather. From that analysis, IMP infers that LN must be tying Nissan to its promotion services. For plaintiff, there could be no other reason for the artists' choice to pair an LN venue with LN promotion.

But that supposition likewise falls short. To prove an antitrust violation, a plaintiff must present evidence that "tends to exclude the possibility" of independent conduct consistent with competition. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986) (quoting Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984)). A successful tying claim in particular needs to rule out alternative market-based explanations for why the consumer might prefer to purchase the tied product along with the tying product. See Serv. & Training, Inc., 963 F.2d at 687-88. In this case, IMP ignores a host of independent reasons that could have led artists on LN tours to freely choose Nissan.

16

One obvious explanation is that LN simply outcompeted IMP and gave artists better compensation to appear in LN venues. In one case, two artists declined Merriweather only after LN offered 100% of the gross ticket sales (minus expenses) to perform at Nissan and another LN amphitheater. J.A. 2716. In another instance, LN enticed a band to play at Nissan by adding $150,000 to the guaranteed payment for a slate of performances around the country. J.A. 6447-48. These differences in artist compensation offered by IMP and LN, clearly signs of competitive negotiations, were curiously missing from IMP's regression analysis.

Plaintiff also ignores the simple fact that it could have been more efficient for artists already on LN tours to work with the same concert promoter and venue operator for their Washington-Baltimore date. The artist may have dealt with LN on other occasions and come to appreciate the working relationship. More broadly, the national promoter holds distinct advantages over its regional competitor: it can offer tour packages combining a series of venues with promotion services in multiple locations. By contrast, IMP is limited to the Washington-Baltimore area, most likely a single stop on any given tour. Accepting a comprehensive and cost-effective package that happens to include Nissan is not tying -- it is simply a good deal for the consumer.

The final and perhaps most salient factor is that Nissan may be a superior venue to Merriweather. IMP scoffs at this idea, boasting that "Merriweather is an iconic amphitheater in a bucolic setting," whereas "Nissan is a concrete shell with horrific parking problems." Appellant's Br. at 42. Setting aside IMP's potential bias for its own venue, Nissan possesses at least some advantages. It carries the prestige and name recognition of being affiliated with a top-flight concert promoter. Nissan also holds over 5000 more seats than Merriweather, nearly all of which are fixed seats that command a higher ticket price than open lawn space, giving Nissan significantly greater earning potential. As the Supreme Court reminds us, "intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others" without any coercion from the seller. Times-Picayune, 345 U.S. at 605; accord Serv. & Training, Inc., 963 F.2d at 687-88. Yet IMP fails to account for Nissan's or LN's inherent advantages, or indeed any explanation of artists' preference for that venue other than an illicit tying arrangement.

Not only did artists have various reasons to choose Nissan of their own accord, but they were also equally free to turn down that venue or LN's entire package deal of venues and tour promotion. Artists have always had two options for structuring their tours. Instead of contracting with a single national

18

promoter for all concert dates, performers can work with local promoters on a concert-by-concert basis and pick any venue they want for a specific date. If at any point LN tried to tie Nissan to its promotion services, the artist could book its tour "locally," use another promoter for the Washington-Baltimore area, and opt for Merriweather instead. When promotion and venues "may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market." Jefferson Parish, 466 U.S. at 11. In other words, LN's combined but non-coercive offer of promotion and venues would not foreclose artists from choosing Merriweather over Nissan or other venue operators like IMP from competing for that business. If, however, LN happened to out-bargain IMP with better package deals, better compensation, and a better venue, then an antitrust lawsuit would not be the answer to plaintiff's troubles.

C.

IMP's venue-to-venue tying claim is largely a repetition of its claim of venue-to-promotion tying. The key difference is the tying product. Plaintiff argues that LN leveraged its market power in areas where it controlled the only amphitheater to force artists to perform at Nissan. Again, IMP presents no direct evidence that LN withheld access to amphitheaters in LN-controlled areas unless artists chose Nissan over Merriweather.

19

Nor does its circumstantial evidence manage to rebut the myriad reasons discussed above for why artists would independently make that choice of venue. The mere fact that artists sometimes took a package deal of multiple LN venues for a given tour does not prove tying. At the same time, the record shows a proportion of non-tied sales that far exceeds the ten-percent benchmark: twenty-six percent of artists who performed at an LN amphitheater in a locality where it owned the only such venue ended up choosing Merriweather, not Nissan, for its Washington-Baltimore show. J.A. 5529-30. With one in four consumers buying the tying product without the tied product, it becomes hard to accept a story of LN strapping Nissan to its other venues and forcing artists to perform there.

The change in the tying product thus makes no difference to plaintiff's case. IMP still fails to prove anything more than, as the district court found, "vigorous competition by Merriweather and Nissan in negotiating with artists to perform at their respective venues." It's My Party, Inc., 88 F. Supp. 3d at 495. In a world of robust market competition where artists were free to take a package deal of promotion and venues, free to purchase those products separately, free to turn down both, and where they in fact exercised all those options to their

advantage, the strands of IMP's reasoning begin to resemble the invisible ropes allegedly tying LN's products together.*

IV.

Quite beyond the specifics of market definitions and product tying, IMP levies a more general attack. Its brief stresses LN's market position as "the largest promoter in the world, larger than all other promoters combined." Appellant's Br. at 63. Size and scope, in IMP's eyes, are cause for suspicion. LN's nationwide reach, "1,000 artist relationships," id., and exclusive access to venues are apparently so dominant that the network itself deters entry into the industry and unfairly disadvantages localized competitors like IMP. Id. at 63-65. According to plaintiff, "attempting to replicate LN's network and promotion relationships would cost 'billions.'" Id. at 63.

The sweeping attack upon LN's size in this action cannot without more suffice to prove an antitrust infraction. Upon further inspection, what plaintiff characterizes as illegal conduct turns out to be lawful pro-competitive behavior. To hold otherwise would have the most serious implications. Carried to

---

* IMP's other claims of anticompetitive conduct by LN fall in tandem with its tying allegations since all are based on the same misconceptions. Likewise, plaintiff's state antitrust law claims echo its allegations under the Sherman Act and thus also fail. Finally, plaintiff's remaining state-law claims fail for the reasons outlined by the district court.

their logical end, plaintiff's arguments would cast a pall over all manner of packaged deals, free contractual negotiations, and any endeavor to become the dominant player in an industry. To do so would undermine the very competition that antitrust law was designed to encourage. See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system.").

The word "tying" at the core of plaintiff's claims carries a sinister connotation, evoking the image of an unwelcome parasite tightly bound to the desired product with the helpless consumer unable to take one without the other. In outlawing tying arrangements, Congress and the Court were originally concerned with egregious forms of leverage, such as tacking superfluous goods onto a patented product. Areeda & Hovenkamp, supra, at ¶ 1700d. That leverage was understandably seen as an unfair way for monopolists in one market to invade related markets. Erik Hovenkamp & Herbert Hovenkamp, Tying Arrangements and Antitrust Harm, 52 Ariz. L Rev. 925, 931 (2010).

Yet even as the Court recognized that evil, it hastened to stress the value of offering "package sales" of multiple goods, "conduct that is entirely consistent with the Sherman Act." Jefferson Parish, 466 U.S. at 12; see also Serv. & Training,

22

_Inc._, 963 F.2d at 688. What buyers often want is "the purchase of several related products in a single competitively attractive package," especially where each component alone would hold comparatively little value. _Phillips v. Crown Cent. Petroleum Corp._, 602 F.2d 616, 628 (4th Cir. 1979) (giving the example of a restaurant franchise as a packaged product desired by restaurateurs). Offering an "attractive package," however, becomes indistinguishable from anticompetitive conduct under IMP's conception of coercion-less tying. If that view carries the day, no seller could combine related goods or leverage its competitive advantage in related markets without risking antitrust charges.

The real loss would be the productive synergies created when sellers package complementary products. LN's business model serves as an example. When LN bundles promotion, including financing and advertising, and a series of concert venues together, it becomes a one-stop shop for touring artists. In such a case, the practice of "[b]undling obviously saves distribution and consumer transaction costs . . . [and] can also capitalize on certain economies of scope." _United States v. Microsoft Corp._, 253 F.3d 34, 87 (D.C. Cir. 2001). Artists do not have to seek out and transact with separate sellers for each of the services offered by LN.

23

The whole thereby becomes greater than the sum of its parts as LN is able to offer advantages only made possible by selling distinct but complementary products together. As one example, managing concerts in multiple locations allows LN to "cross-collateralize" its tours. It's My Party, 88 F. Supp. 3d at 481. The national promoter can "cover losses from concerts that underperformed with revenue from concerts that met or exceeded expectations," thereby reducing the overall risk for itself and for the artists. Id. A local promoter responsible for a single concert in a single location lacks this risk-pooling ability. It is likely one reason why national promoters are often able to attract artists with a higher guaranteed payment, while their local counterparts can only offer a cut of the ticket sales for a particular show. Id. If, however, the packaging inherent in coordinating concert tours were deemed unlawful tying, for instance of one venue to another, then this synergy and its attendant benefits would be at risk.

Of course, the idea of synergy is not unique to the live music industry. It, and thus the potential for tying, is present whenever products or production processes fit naturally together. A prime example is vertical integration, where a firm houses multiple stages of the production and distribution process for a single good or related goods. Andy C. M. Chen & Keith N. Hylton, Procompetitive Theories of Vertical Control, 50

Hastings L.J. 573, 578 (1999). Take a computer manufacturer, for example, that "makes its own steel, types its own documents, creates and places its own advertising, transports the finished product to dealers, or repairs the product in the hands of consumers. To that extent it 'forecloses' independent makers of steel or suppliers of typing, advertising, transportation or repair services." Areeda & Hovenkamp, supra, at ¶ 1700j1. One could conceivably accuse the vertically integrated manufacturer of tying those goods and services together in selling the end product, the computer.

And yet it is no surprise that vertical integration has generally been permitted despite its apparent similarity to tying. See id. (noting antitrust law's tolerance of vertical integration); Roger D. Blair & David L. Kaserman, Vertical Integration, Tying, and Antitrust Policy, 68 Am. Econ. Rev. 397 (discussing the functional similarities between tying and vertical integration). A single firm incorporating separate but closely related production processes can often be far more efficient than various independent entities transacting to produce the same good or bundle of goods. See Jefferson Parish, 466 U.S. at 41 (O'Connor, J., concurring in judgment) (quoting Fortner Enters. v. U.S. Steel Corp., 394 U.S. 495, 514 n.9 (White, J., dissenting) (1969)). With advances in modern technology comes even greater potential for efficient

25

integration, increased compatibility among products, and ties that are technological as much as or more than contractual. See Areeda & Hovenkamp, supra, at ¶ 1701d. It would be unfortunate if an overly aggressive tying doctrine were to impede that innovation.

Because concert venues and promotion are not technically part of the same production process, this may not be a case involving vertical integration per se. Nonetheless, one can see how IMP's expansive tying definition could chill constructive forms of integration. Unable to sell goods and products as a single unit, businesses may have little reason to consolidate underlying production processes and promotional strategies no matter how efficiently they fit together. The eventual outcome would be a strange world in which sellers go out of their way to isolate their own products and different components of their production and promotion processes from one other.

The ultimate victim in that scenario would be the consumer and his ability to freely contract for desired goods and services. So long as a transaction is free from coercion, the consumer has every right to walk away from package deals or demand more from the seller. It is paternalistic for either a competitor or the court to just assume that taking two products together is not the result of independent decision-making. See Microsoft, 253 F.3d at 87-88 (reiterating consumer choice as the

26

touchstone of tying doctrine and the need to assess whether consumers prefer to buy products together).

From its market definitions to its descriptions of anticompetitive conduct, IMP's entire case sets up a David-and-Goliath battle between an industry behemoth and its regional challenger. The tying argument in particular is predicated on the fact that LN can leverage its sprawling national network of promoters and venues to oblige artists to perform at Nissan. At certain points, the whole argument seems to turn on LN's dominant market position, on what LN is rather than what it did. It may be understandable as a matter of strategy for antitrust plaintiffs to target industry giants. Certainly, many such cases do require a finding of market power, and the evidence may show what it fails to show here, namely that the dominant player in an industry used that very domination for anticompetitive ends. See E.I. du Pont de Nemours & Co., 351 U.S. at 389-90 (focusing monopolization doctrine on the exercise of market power to foreclose fair competition).

And yet big is not invariably bad. An outsized market position may reflect nothing more than business success achieved through superior effort and sound strategy. See United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966). After all, the purpose of antitrust law is to penalize anticompetitive practices, not competitive success. Even monopoly power, long

27

considered a red flag in antitrust law, can under certain circumstances be a legitimate advantage:

> Firms may acquire monopoly power by establishing an infrastructure that renders them uniquely suited to serve their customers. Compelling such firms to share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.

Trinko, 540 U.S. at 407-08. LN invested heavily in developing just such an infrastructure, expanding beyond its core promotion business to acquire exclusive booking rights at concert venues nationwide and merging with a leading ticket vendor, Ticketmaster. The synergies among promotion, venues, and ticket sales, all of which serve to bring live music to the public, should be obvious.

In a world where the "big is bad" mantra reigns unquestioned, we would be left with separate tour promoters, separate venue operators, and separate ticket vendors, each with little incentive to interact or join with the others despite their natural affinities. See Fed. Trade Comm'n v. Proctor & Gamble Co., 386 U.S. 568, 597-98 (1967) (Harlan, J., concurring) (considering the possible efficiencies created by merging producers of complementary goods in adjacent markets). IMP's tying allegations thus threaten in the end to bring us three forms of strict economic segregation, first of products, then of

production processes, and finally of producers in adjoining markets. It is not wholly fantastical to wonder if even ketchup and mustard, salt and pepper, forks and knives will have to bid each other adieu, doomed to solitary existences along the grocery aisle.

The Davids of the world need not hope for such a marketplace in order to thrive. Just as big is not necessarily bad, small is not necessarily weak. Even though national firms undoubtedly have an edge over smaller competitors and David may not triumph over Goliath everywhere, he can certainly hone his home court advantage. While LN was busily spreading its operations all over the country, IMP could have focused instead on branding itself as a uniquely attractive local outfit, striving to know the Washington-Baltimore audience better than any other promoter and deepening its relationships with local clubs, businesses, and media. As it is, IMP has in fact enjoyed much success at its Merriweather venue, hosting scores of major artists and doubling its revenue from $11.8 million in 2006 to $22.5 million in 2012. J.A. 827-40, 4908.

IMP's distortion of tying doctrine serves in fact as a potential template for any local business wishing to drive a national competitor out of its regional market. That template would prove particularly useful when, as in this case, the competition is on a local basis and the competitors are a mix of

29

national and local players. If offering products or services across a particular field is tying and if a national network is itself suspect when compared to the resources of a regional contender, then businesses have much less motivation to operate in multiple geographic markets. Why shoulder the costs of expansion when the specter of antitrust liability awaits?

Cornering the local Washington-Baltimore market may not have been far from IMP's mind. Seth Hurwitz, IMP's principal, has protested that "the scourge of the [live music] industry is too many shows." J.A. 1566. According to Hurwitz, LN was "paying way too much money just to keep [a] show away from [IMP]," and the bidding process for concerts -- the key mechanism for price competition among promoters -- made it "prohibitive to actually do a show and make money." J.A. 1560, 1562. To ease what it considered an excess of competition, Hurwitz sought to eliminate its archrival. He suggested either that LN "sell the Nissan/Jiffy Lube property" or that the two promoters "work together" to stop bidding against each other when bringing artists to the Washington-Baltimore area. J.A. 1560-62, 1570. After failing to collude with LN or expel it from the market, plaintiff turned to the next best option -- antitrust law.

This case thus captures the anticompetitive effects and consequences that can ironically arise from antitrust lawsuits. See Matsushita Elec. Indus., 475 U.S. at 594 (warning against

30

allowing antitrust doctrine to "chill the very conduct the antitrust laws are designed to protect"); William J. Baumol & Janusz A. Ordover, Use of Antitrust to Subvert Competition, 28 J.L. & Econ. 247 (1985). This can be a special hazard in antitrust litigation brought by competitors of the defendant. See Edward A. Snyder & Thomas E. Kauper, Misuse of the Antitrust Laws: The Competitor Plaintiff, 90 Mich. L. Rev. 551 (1991). If abused, such suits can ineluctably lead to an environment of commercial parochialism. By cutting ties among related products and related producers, IMP's view of economic activity, if allowed to take hold, would box firms both into their own product markets and into their own geographic locales. That tendency toward isolationism has more in common with the market squares and horse-drawn buggies of the nineteenth century than with the interconnected and technology-driven contemporary world. The loser in all this is of course the consumer, left with a patchwork of localized monopolies and one-product wonders flourishing at the expense of larger and more diverse competitors. To help prevent antitrust law from being hijacked for such anticompetitive ends, we join the district court in sending this tussle between two rivals back to the marketplace from whence it came. The judgment is hereby

AFFIRMED.