**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 14, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SUTURE EXPRESS, INC.,

      Plaintiff - Appellant,

v.

OWENS & MINOR DISTRIBUTION, INC.; CARDINAL HEALTH 200, LLC,

      Defendants - Appellees.

--------------------------

JOSEPH P. BAUER; WILLIAM S. CHOI; JOSHUA P. DAVIS; JOHN B. KIRKWOOD; IOANNIS LIANOS; BARRY NALEBUFF; IVAN REIDEL,

      Amici Curiae.

No. 16-3065

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:12-CV-02760-DDC)**

---

Sanford I. Weisburst (Stephen R. Neuwirth, David M. Cooper, and Yelena Konanova of Quinn, Emanuel, Urquhart & Sullivan, LLP, New York, New York; Daniel M. Abuhoff, Michael Schaper, and Erica S. Weisgerber of Debevoise & Plimpton, L.L.P., New York, New York; Sean Delphey of Quinn, Emanuel, Urquhart & Sullivan, L.L.P., Washington, D.C., with him on the briefs), New York, New York, for Plaintiff - Appellant.

Paula W. Render and Shari Ross Lahlou (Michael Sennett and Eric P. Berlin of

Jones Day, Chicago, Illinois; Michelle K. Fischer of Jones Day, Cleveland, Ohio, and Clifton S. Elgarten and Luke van Houwelingen of Crowell & Moring, LLP, Washington, D.C., with them on the brief), for Defendants - Appellees.

David A. Balto, Bradley A. Wasser, and Matthew C. Lane of Law Offices of David A. Balto, Washington, D.C., for Amici Curiae.

---

Before **KELLY**, **LUCERO**, and **MURPHY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiff-Appellant Suture Express, Inc. appeals from the district court's entry of summary judgment in favor of Cardinal Health 200, LLC ("Cardinal") and Owens & Minor Distribution, Inc. ("O&M") under Section 1 of the Sherman Antitrust Act, Section 3 of the Clayton Act, and the Kansas Restraint of Trade Act ("KRTA").  See Suture Express, Inc. v. Owens & Minor Distrib., Inc., No. 12-2760-DDC-KGS, 2016 WL 1377342 (D. Kan. Apr. 7, 2016).  Finding jurisdiction under 28 U.S.C. § 1291, we affirm.

<u>Background</u>[1]

A.    <u>The Business</u>

Suture Express, Cardinal, and O&M compete in the medical-and-surgical ("med-surg") supply and distribution market. Cardinal and O&M, along with one other company not part of this lawsuit, Medline Industries, Inc. ("Medline"), are national broadline distributors, meaning they contract with hospitals and other acute healthcare providers to distribute a full line of med-surg products. This includes about 30 categories, ranging from custom surgical kits, bedpans, and hospital gowns to IV sets and solutions, gloves, and needles and syringes. In total, Cardinal distributes more than 300,000 individual med-surg products, while O&M distributes more than 220,000. 7 J.A. 1380; 10 J.A. 1723 n.2. Many of these med-surg products are heavy or bulky, so Cardinal and O&M use a network of regional distribution centers to store the inventory and then use trucks to make deliveries to the hospitals. Cardinal operates 48 such distribution centers; O&M, 43.

In 1998, Suture Express entered the med-surg market. Instead of

---

[1] The majority of these background facts were stipulated by the parties and recounted in the district court's Pretrial Order. 7 J.A. 1291–1301. Because this is an appeal from the district court's grant of Cardinal and O&M's motion for summary judgment, to the extent facts are disputed we assume that any nonconclusory version presented by Suture Express is correct. <u>Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.</u>, 63 F.3d 1540, 1545 (10th Cir. 1995) (citing <u>Eastman Kodak Co. v. Image Tech. Servs., Inc.</u>, 504 U.S. 451, 456 (1992)).

competing as another broadline distributor, however, Suture Express specialized in supplying only one category of med-surg: sutures. In 2002, it also began distributing endomechanical supplies, which are used for minimally invasive or laproscopic surgeries. These two product categories, together known as "suture-endo," differ from other med-surg in that they are typically smaller and lighter. A box of sutures, for example, is smaller than a box of Kleenex tissues and weighs not much more than the empty box. Suture-endo products also have a high-dollar value relative to their size and weight, and there exists a broader variety of these products than of any other single category of med-surg.

Because of these distinctive characteristics of suture-endo, Suture Express utilized a different distribution model. Instead of using regional warehouses and delivering products by truck, Suture Express stocked all its inventory in a single warehouse in Lenexa, Kansas, and then contracted with FedEx to provide overnight delivery to ordering hospitals. By specializing in suture-endo, and by using this new distribution model, Suture Express was often able to have on hand a broader variety of suture-endo than did the broadline distributors — who, after all, had many more product categories to keep stocked across many more warehouses.

This specialization also allowed Suture Express to achieve very high fill rates. A fill rate is the percentage of "filled" orders by a distributor on a timely basis. If a distributor timely ships nine of the ten items a customer orders, the fill

rate for that order is 90%. Fill rates are important to hospitals because they can directly affect when services can be provided: if the suture-endo the hospital ordered yesterday did not come in today as expected, a surgeon might have to delay a surgery. Suture Express has maintained a fill rate higher than 99%, which is often higher than the rates achieved by O&M and Cardinal for the same product categories. See 6 J.A. 1127–29.

B.    The Market

For purposes of this case, the relevant market is limited to the national distribution of med-surg products to acute care providers. Suture Express, 2016 WL 1377342, at *4. That market is divided into two broad categories: (1) suture-endo, which comprises roughly 10% of the overall med-surg market; and (2) "other-med-surg," which includes everything else — the other 90%. This division is somewhat artificial because no acute care provider needs only suture-endo but not other-med-surg — or vice versa — but it is helpful since Suture Express mainly provides one category but not the other. 7 J.A. 1294.

According to Suture Express's expert witness, Professor Einer Elhauge, the suture-endo market has grown over time, expanding from about $1.97 billion in distribution revenues in 2007 to roughly $2.36 billion in 2012. During that same time period, Suture Express was able to capture between 8% and 10% of the market. 23 J.A. 3069; 2 J.A. 352. In comparison, during these six years, Cardinal's share of the suture-endo market declined from 30% to 26%, and

- 5 -

O&M's share grew from 40% to 42%. 2 J.A. 352.

In the other-med-surg market, Cardinal and O&M together accounted for the majority of sales to acute care providers. Id. at 353. Between 2007 and 2012, Cardinal's share of other-med-surg sales decreased from 31% to 27%, while O&M's share grew from 33% to 38%. Id.

Broadly speaking, the rest of the med-surg distribution market was generally controlled by (a) Medline, the third national broadline distributor, and (b) regional distributors, such as Seneca Medical, MMS, Inc., and the Claflin Company. These companies are not parties to the case, and their specific shares of the acute provider market are not clear. Their presence, however, is not insignificant. Medline, for instance, doubled the amount of its revenue coming from total med-surg sales between 2008 and 2012. In that last year, the company's total med-surg revenues approximated roughly half of O&M's and about two-thirds of Cardinal's.[2] See 11 J.A. 1998, 2021. Likewise, its total suture-endo sales equated to nearly two-thirds of Suture Express's, and to roughly a quarter of Cardinal's and 15% of O&M's suture-endo sales to acute care providers. See id. at 1998; 23 J.A. 3069.

Some of the regional distributors have also grown their market shares — though, again, it is not clear from the record by how much or what percentage of

---

[2] "Total" sales includes those made to both acute and non-acute care providers, rather than simply to acute care providers.

the relevant markets they control. Seneca Medical, for example, distributes about 90,000 different products across 12 states, has grown by about 50% in the last half-decade, and controls about 15% of the med-surg market in its region. 8 J.A. 1416–24; see Suture Express, 2016 WL 1377342, at *10. Cardinal, O&M, and Suture Express have all won and lost contracts against Medline and certain regional distributors.

There are approximately 4800 acute care providers that are consumers in the med-surg market. 1 J.A. 48. They have three main choices in how they purchase medical supplies. First, they can contract directly with med-surg manufacturers and perform distribution functions themselves. Second, they can contract with distributors, allowing the hospital to place one or two main orders instead of many separate orders across manufacturers. Third, the hospitals and hospital systems can group together to consolidate purchasing power to negotiate favorable contracts with one or more distributors or manufacturers. Of course, these three options are not mutually exclusive.

Most med-surg distributors use a "cost-plus markup" fee arrangement, by which the customer is charged the cost of the product plus a negotiated fixed percentage distribution fee. There can also be additional costs, and certain rebates, depending on the nature of the customer's contract with the distributor(s) and/or manufacturer(s). Suture Express, for instance, typically charges a $7 per day per location freight fee on top of its cost-plus markup.

Between 2007 and 2012, average markups decreased for Cardinal, O&M, and Suture Express, as well as for some of the regional distributors. This was true both in the other-med-surg and the suture-endo markets, though markups in the other-med-surg market were higher throughout the time period, even through the more substantial decline in that market. 2 J.A. 332. Within the suture-endo market specifically, Cardinal's and O&M's markups were always higher than Suture Express's — though, again, all declined somewhat between 2007 and 2012. Id. at 361. Finally, overall profit margins for O&M and Cardinal have also declined since 2008. 11 J.A. 2023–24.

C.      The Bundling Package

After Suture Express entered the suture-endo market and steadily grew its market share, Cardinal and O&M responded by instituting bundling packages in their contracts. Though these packages took different forms, the overarching result was that the customer would pay more (usually one percent more) for its other-med-surg orders unless it also ordered its suture-endo through the same distributor. For instance, some Cardinal contracts required the customer to purchase all its suture-endo from Cardinal or face markups on its other-med-surg orders; other contracts required the customer to purchase a certain percentage (e.g., 95%) of all its med-surg from Cardinal or pay price markups. O&M instituted similar packages, making the price of other-med-surg increase if the

customer did not also buy its suture-endo through O&M.[3]  However, in at least some of the contracts, if the hospital purchased its suture-endo directly from the manufacturer, no penalty would be charged; such purchases were exempted from the percentage requirement.  See 6 J.A. 956; 5 J.A. 830.

Whether viewed as a bundling discount (as Cardinal and O&M officially describe it) or as a penalty (as Suture Express and some internal communications at Cardinal and O&M call it), the effect was that customers ended up paying more overall if they ordered suture-endo through Suture Express and other-med-surg through Cardinal / O&M than if they just ordered everything through their broadline distributor — even though Suture Express charged less for its suture-endo than did Cardinal or O&M.  For instance, before the bundling terms were put into effect, one hospital would typically buy about $750,000 worth of suture-endo per year and about $7,000,000 of other-med-surg.  Buying the former from Suture Express and the latter from Cardinal would save the hospital about $18,750.  But with the bundling term added, Cardinal would increase the hospital's other-med-surg markup by one percent if it did not also buy its suture-endo from Cardinal.  Since this would translate into a $70,000 increase on the hospital's other-med-surg, the $18,000 in suture-endo savings would not be worth the price of doing business with Suture Express.  24 J.A. 3301; 18 J.A. 2615–16;

_____

[3] Medline, the other national broadline distributor who is not a party to this case, used similar bundling packages.  So did many of the regional distributors, such as Seneca Medical and MMS.

2 J.A. 400 n.234.

D.      Suture Express's Claim and the Opinion Below

Suture Express sued Cardinal and O&M, alleging that their bundling arrangements constituted an illegal tying practice in violation of federal and state antitrust laws.  On cross motions for summary judgment, the district court granted summary judgment for Cardinal and O&M.  Suture Express, 2016 WL 1377342, at *36.  The court held that Suture Express's federal claims failed as a matter of law because it could not establish that either Cardinal or O&M individually possessed sufficient market power in the other-med-surg market that would permit it to restrain trade in the suture-endo market.  Id. at *25.  Even were this not the case, however, the court also held that (a) Suture Express could not establish antitrust injury because it had not shown that competition itself had been harmed, id. at *26–28, and (b) Cardinal and O&M cited sufficient procompetitive justifications for the bundling arrangement to overcome any harm caused by any anticompetitive effects resulting from the bundle, id. at *28–32.  As for the state law claim, the court ruled that Suture Express could not show antitrust injury or that Cardinal's or O&M's bundling practices were designed to impede competition.

On appeal, Suture Express argues that these conclusions were in error.  According to Suture Express, the district court erred in its market power analysis by not considering the effects in the tied (suture-endo) market, by not

appropriately considering Professor Elhauge's application of the discount-attribution test, by accepting that bundle-to-bundle competition is necessarily procompetitive, and by concluding that reasonable jurors could not find market power based on evidence about the other-med-surg market. Aplt. Br. at 31–50. Likewise, Suture Express contends that reasonable jurors could find antitrust injury in the suture-endo market and that Cardinal's and O&M's bundling terms were not procompetitive. Id. at 50–61. And finally, Suture Express says that the district court erred in its KRTA analysis because reasonable jurors could find that Cardinal and O&M violated the state antitrust law regardless of whether they also violated federal law. Id. at 62.

## Discussion

We review the district court's grant of summary judgment de novo, making all reasonable factual inferences in the light most favorable to the nonmovant, Suture Express. Fed. R. Civ. P. 56(a); Multistate Legal Studies, 63 F.3d at 1545 (citing Eastman Kodak, 504 U.S. at 456).

A.    Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits unreasonable restraints of trade. See 15 U.S.C. § 1; Law v. NCAA, 134 F.3d 1010, 1016 (10th Cir. 1998). Tying arrangements do not necessarily constitute illegal restraints. A tie-in exists when a seller conditions its sale of a product (the "tying" product) on the purchase of a

second product (the "tied" product). See Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 31 (2006). In addition to outright refusals to sell two products separately, tie-ins can also include instances of discount bundling — when a seller charges less for a package of two products linked together than the sum of the prices at which it sells each product individually. See X Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1758 (3d ed. 2011) [hereinafter Areeda & Hovenkamp]; see also Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 900–01 (9th Cir. 2007) (explaining differences and similarities between a package discount and a traditional tie).

Since tying arrangements can be used for good or for ill (i.e., can have procompetitive or anticompetitive effects), the arrangement itself is only problematic when it is used to unreasonably restrain trade. Indeed, "[b]uyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively — conduct that is entirely consistent with the Sherman Act." Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984), abrogated on other grounds by Ill. Tool Works, 547 U.S. at 31.

The Supreme Court has explained that illicit tying arrangements occur "when the seller has some special ability — usually called 'market power' — to force a purchaser to do something that he would not do in a competitive market." Id. at 13–14. Thus, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the

buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." Id. at 12.

As with most other antitrust claims, tying arrangements can be analyzed using a per se rule or a rule of reason. See id. at 15–16, 18. The four elements of a per se tying violation are: (1) two separate products are involved; (2) the sale or agreement to sell one product is conditioned on the purchase of the other; (3) the seller has sufficient economic power in the tying product market to enable it to restrain trade in the tied product market; and (4) a "not insubstantial" amount of interstate commerce in the tied product is affected. Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 886 (10th Cir. 1997) (citations omitted).

On Cardinal and O&M's initial motion to dismiss, the district court ruled that Suture Express could not establish a plausible per se tying violation but that it was free to move forward under the rule of reason. See Suture Express, Inc. v. Cardinal Health 200, LLC, 963 F. Supp. 2d 1212, 1219–20 (D. Kan. 2013). Under the rule of reason, the plaintiff has the burden of showing that the defendant "unreasonably restrained competition" in violation of the Sherman Act. Hyde, 466 U.S. at 29; see also Fortner Enters., Inc. v. U.S. Steel Corp. (Fortner I), 394 U.S. 495, 499–500 (1969) ("A plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the

Sherman Act have been violated."). This "necessarily involves an inquiry into the actual effect of the [tying arrangement] on competition." Hyde, 466 U.S. at 29.

Beyond this general proposition, caselaw on tying claims under the rule of reason is "amazingly sparse." Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 482 (3d Cir. 1992) (en banc). Because the Supreme Court has continued to add more real-market analysis to the requirements of a per se tying claim, though, the rule of reason seems to be mainly different in degree, not necessarily in kind. See Hyde, 466 U.S. at 34 (O'Connor, J., concurring). One difference, however, is that the rule of reason is more receptive to procompetitive justifications for the tying arrangement and more willing to examine the effects of that arrangement in both the tying and tied markets. See generally IX Areeda & Hovenkamp, supra, ¶¶ 1728b-f, 1730b–c. And, as with the rule of reason in other contexts, there is a burden-shifting component to the analysis. First, the burden falls on the plaintiff to establish a prima facie showing of a substantially adverse effect on competition. If that occurs, then the burden shifts to the defendant to come forward with evidence of procompetitive justifications for the practice. Finally, the burden then shifts back to the plaintiff to rebut the defense by showing either that the proffered justification is illegitimate, that the challenged conduct is not necessary to achieve the legitimate objectives, or that the objectives can be achieved by other means that negatively affect competition far less. See Law, 134 F.3d at 1019 (explaining rule-of-reason

burden shifting in horizontal price-fixing context); see also United States v. Microsoft Corp., 253 F.3d 34, 95–96 (D.C. Cir. 2001) (per curiam) (applying framework to Section 1 tying).

Suture Express argues that Cardinal's and O&M's bundling package meets all four elements of a per se tying claim — and thus, implicitly, that the arrangement unreasonably restrains competition and violates the rule of reason. First, the two product categories involved are other-med-surg (the "tying product") and suture-endo (the "tied product"). Second, the agreement to sell other-med-surg at a favorable price is conditioned on the purchase of suture-endo. Third, Cardinal and O&M together comprise nearly 70% of the tying (other-med-surg) market, enabling them to restrain trade in the tied (suture-endo) market. Fourth, a significant amount of commerce in the suture-endo market is negatively affected since acute care providers cannot get the better deal at Suture Express due to the bundling packages.

Applying the rule of reason on summary judgment, the district court found genuine factual disputes on the first and second factors,[4] but ruled for Cardinal and O&M on the third — that Suture Express could not prove that Cardinal or

---

[4] Again, under the rule of reason, the plaintiff bears the burden of showing that the restraint of trade is, on balance, unreasonable. See Law, 134 F.3d at 1019. Thus, the per se "elements" are in fact more akin to "factors" under this analysis, useful for providing a framework forward but perhaps not themselves actual requirements for a plaintiff to establish a prima facie case. See Fortner I, 394 U.S. at 499–500.

O&M individually possessed sufficient power in the other-med-surg market that would allow either of them to restrain trade in the suture-endo market. The court then went on to consider whether Suture Express had established antitrust injury (no), whether any justifications for the bundling arrangement existed (yes), and the overall market effects of the bundle (procompetitive). We consider each finding in turn as necessary.

### 1. *Market Power*

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." Ill. Tool Works, 547 U.S. at 46. Market power is the power "to force a purchaser to do something that he would not do in a competitive market," Hyde, 466 U.S. at 14, and often takes the form of a seller's ability "to raise price and restrict output," Eastman Kodak, 504 U.S. at 464 (quoting Fortner I, 394 U.S. at 503). To demonstrate market power, a plaintiff "may show evidence of either power to control prices or the power to exclude competition." Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 966 (10th Cir. 1990) (emphasis, internal quotation marks, and citation omitted). Importantly, this power over price can take the form of a tying arrangement if the price could have been raised but the tie was demanded instead. Fortner I, 394 U.S. at 504.

Market power is important because if the defendant has substantial power in the tying market, then the tie has the potential of injuring competition by

forcing consumers to take the tied product just to get the tying one. See Hyde, 466 U.S. at 12. Without power in the tying market, we would expect that a customer would not feel obliged to take the tie, as he could simply go elsewhere to buy the tying and tied products separately. Town Sound & Custom Tops, 959 F.2d at 476; X Areeda & Hovenkamp, supra, ¶ 1734a.

Though the majority of Supreme Court (and our) cases discussing the need to prove market power as part of a tying claim are per se cases, we see no reason why the same theoretical underpinning would not make the inquiry relevant under a rule of reason analysis. Even so, we note "that the Supreme Court has suggested that there may be situations in which a specific and detailed showing of market power may not be necessary in a section 1 Rule of Reason case." Reazin, 899 F.2d at 966; see also FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460–61 (1986) (explaining in Section 5 Federal Trade Commission Act case that "[s]ince the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects" (internal quotation marks and citation omitted)). We also acknowledge that there is a circuit split about whether a tying case examined under the rule of reason

presents such a situation.[5]

We need not weigh in on the dispute at this time, however, given that all parties here assumed that market power was required and therefore presented detailed evidence to support their positions.  See Aplt. Br. at 29; Aplee. Br. at 21;

---

[5]  Compare Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 511 (3d Cir. 1998) ("Where appreciable tying market power cannot be shown, inquiry into the tied product market cannot be avoided, and the plaintiff therefore has the more difficult burden of showing that the arrangement violated the rule of reason because it unreasonably restrained competition in the tied product market."), Breaux Bros. Farms, Inc. v. Teche Sugar Co., 21 F.3d 83, 88 (5th Cir. 1994) (noting plaintiffs could prevail in absence of showing market power if they proved an "unreasonable restraint of trade"), and Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 799 (1st Cir. 1988) (Breyer, J.) (examining competitive effects under rule of reason after determining plaintiffs had not shown market power to satisfy per se rule), with PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 815 n.2 (6th Cir. 1997) (explaining that "market power in the tying product market is an indispensable requirement under either per se or rule-of-reason analysis" because the two theories have "merge[d]"), Dig. Equip. Corp. v. Uniq Dig. Techs., Inc., 73 F.3d 756, 761 (7th Cir. 1996) ("[S]ubstantial market power is an indispensable ingredient of every claim under the Rule of Reason."), and Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502–03 (11th Cir. 1985) (listing per se elements in rule of reason analysis).

The Supreme Court's most recent foray into tying analysis did not resolve the issue.  In Illinois Tool Works, the Court held that a patent in the tying market would no longer be dispositive of market power for purposes of a per se tying claim, and therefore required a plaintiff to prove market power instead of simply relying on the presumption.  547 U.S. at 45.  In abolishing that presumption, though, the Court did not necessarily abrogate the rule from Hyde applicable to the rule of reason: "When . . . the seller does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market."  466 U.S. at 17–18; see id. at 29.

cf. Reazin, 899 F.2d at 968 n.24.  Instead, we will simply assume without deciding that a showing of tying market power is required under the rule of reason.

With this said, we do think that tied market effects can be appropriate evidence of tying market power in a rule of reason case, though it cannot be dispositive.  The Supreme Court suggested as much in Eastman Kodak, 504 U.S. at 477.  In that case, Kodak sold photocopiers, and then also sold (a) replacement parts and (b) repair service.  In response to independent service agents offering repair service at a lower price, Kodak restricted the sale of replacement parts to buyers who either also purchased the Kodak repair service or who repaired their own machines.  The independent agents then sued Kodak, alleging the company unlawfully restrained competition by tying the sale of service (tied market) to the sale of the parts (tying market).  Kodak responded that the arrangement could not be unlawful because it lacked market power in the tying (parts) market since if it raised prices there it would suffer corresponding losses in the photocopier market.  The Supreme Court rejected this proposed legal rule and consequently denied summary judgment to Kodak, instead noting that it would at least be reasonable for a jury to infer that Kodak had market power "to raise prices and drive out competition in the aftermarkets [i.e., (a) parts and (b) service], since respondents

offer direct evidence that Kodak did so."[6]  Id.

Following Eastman Kodak, the Ninth Circuit considered evidence of tied-market effects in a Section 2 case, noting that the lower pricing of the tied good — there, primary and secondary health services — by the plaintiff was evidence of an illicit tying arrangement by the defendant, who had tied access to its tertiary health services (tying market) to purchase of its primary and secondary services (tied market).  See PeaceHealth, 515 F.3d at 915.  The court concluded that, "while not dispositive evidence of an illegal tie, it is a permissible inference that a rational customer would not purchase [the defendant's] allegedly overpriced product in the absence of a tie."  Id.

As Cardinal and O&M point out, neither Eastman Kodak nor PeaceHealth are quite on all fours with this case because the defendants in those cases exercised a near-monopoly in the tying market.  Aplee. Br. at 38–40; see Eastman Kodak, 504 U.S. at 464 (Kodak parts available almost "exclusively" from Kodak); PeaceHealth, 515 F.3d at 915 ("PeaceHealth was the only provider of tertiary

---

[6] Justice Scalia dissented because (among other reasons) he thought the Court erred in accepting the plaintiffs' market definition and in its analysis of aftermarket effects in the per se claim.  But, supporting the use of direct evidence under the rule of reason, he wrote: "I would instead evaluate the aftermarket tie alleged in this case under the rule of reason, where the tie's *actual* anticompetitive effect in the tied product market, together with its potential economic benefits, can be fully captured in the analysis.  Disposition of this case does not require such an examination, however, as [plaintiffs] apparently waived any rule-of-reason claim they may have had in the District Court."  Eastman Kodak, 504 U.S. at 502–03 (Scalia, J., dissenting) (citation omitted).

services in the relevant geographic market."). Thus, they contend, the direct evidence was used either as further support of coercion, as in PeaceHealth, or to reject an economic theory and proposed rule of law, as in Eastman Kodak, but it was not used to demonstrate market power.

These distinctions, however, only confirm that we should not consider direct evidence of tied market effects as conclusive — a warning the Supreme Court has also issued. See U.S. Steel Corp. v. Fortner Enters., Inc. (Fortner II), 429 U.S. 610, 618 (1977) (finding evidence that customers paid a noncompetitive price for the tied good insufficient by itself to support illicit tying claim). That the evidence is not dispositive, however, does not mean it should not be considered. See PeaceHealth, 515 F.3d at 915. Since market power is the power to "force a purchaser to do something that he would not do in a competitive market," Hyde, 466 U.S. at 14, if a purchaser has indeed been coerced into doing something he would not normally do, why would it not follow that this coercion could be (though is not necessarily) because of market power in the tying market? And under the rule of reason, why should such evidence not at least be considered, especially when (as here) there exists a genuine issue of material fact as to coercion?[7] See Suture Express, 2016 WL 1377342, at *17. We think it

---

[7] Cardinal and O&M also argue that PeaceHealth is inapposite because the court's discussion on direct effects in the tied market took place during its discussion of economic coercion — i.e., whether the sale of one product was conditioned on the purchase of another. Aplee. Br. at 40. This is true, but it does not mean the two elements were unrelated. In fact, they were: the Ninth Circuit

should be.

At last, then, we turn to the evidence presented in this case and to the district court's consideration of it. The district court held that Suture Express had not met its burden of producing evidence that demonstrated Cardinal's or O&M's ability to exclude competition or control price. As to the first, the court found that neither of the companies could exclude competition in the tying market since there was evidence the opposite was occurring, with regional and national competitors growing and expanding during the pertinent time period. See id. at *24. Further, since Medline and the regional distributors also offered similar bundling packages, competition was not excluded in the tied market, either: it simply took the form of bundle-to-bundle competition. Id. (Though the district court did not label it as such, this is, of course, direct evidence of tied market effects.) These bundling packages, the court also found, did not result in prohibitively high switching costs for customers, which could be indicative of market exclusion. Though some customers noted that the cost of switching distributors required an investment of time and overhead, the court concluded that "the record is filled with examples of customers who, in fact, have switched distributors on a regular basis." Id. at *22.

As for pricing, the court found that evidence of Cardinal's and O&M's

_____

described its inquiry as whether "the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product." PeaceHealth, 515 F.3d at 913.

declining profit margins in the other-med-surg market revealed that they did not have the ability to control prices in that market. Id. at *25. The court thought the evidence showing consolidation in the buyer (i.e., acute care provider) market instead demonstrated enhanced bargaining power, which could also help explain Cardinal's and O&M's inability to control pricing. In sum, the court wrote, "the undisputed facts demonstrate a market where O&M and Cardinal compete vigorously against Medline, certain regional distributors, and each other. And, after three or four years, O&M and Cardinal can retain only about half of their acute care customers. These facts preclude any triable dispute about defendants' market power." Id.

This is persuasive evidence of a lack of market power. Suture Express contends, though, that it is not enough to settle the question as a matter of law. For instance, it notes that tying market share is very relevant to the inquiry, and contends that even if 31% and 38% market shares (Cardinal's and O&M's high points, respectively) would not be enough to win under the per se rule, it should nevertheless be enough to survive summary judgment under the rule of reason. See Aplt. Br. at 40 (citing Breaux Bros., 21 F.3d at 87).

Perhaps. Though the Supreme Court has noted that a hospital's 30% market share lacked the "kind of dominant market position that obviates the need for further inquiry into actual competitive conditions," Hyde, 466 U.S. at 27, courts have used that benchmark as a floor for plaintiffs seeking to prove a per se

- 23 -

claim, e.g., Grappone, 858 F.2d at 796.  In a rule of reason case, it is reasonable to conclude that other indicia can tip the balance in favor of a showing of market power, even if one begins with a lower showing of market share.  See Breaux Bros., 21 F.3d at 87–88 (allowing plaintiff to proceed under rule of reason when it showed that defendant controlled 17.5% of the tying market).  But just as "market share alone is insufficient to establish market power," Reazin, 899 F.2d at 967 (citations omitted), it is also insufficient to counteract the other market realities present here that point to increased competition and lower prices.

Suture Express responds that this other evidence is actually misleading. First, it contends that Professor Elhauge's calculations that between 56% and 64% of the suture-endo market was bound by contracts with Cardinal and O&M and thus could not buy suture-endo from Suture Express constitute direct evidence of Cardinal's and O&M's power over price.  See Aplt. Br. at 37.  This is because, it says, "in the but-for world without the challenged conduct," buyers would have bought suture-endo from Suture Express and paid less.  Id. at 38.

Second, Suture Express argues that bundle-to-bundle competition does not itself demonstrate an inability to raise prices or exclude competition.  It could be, for instance, that all the firms offering the bundle are inefficient producers of one of the product categories.  This would make consumers worse off in a world without the more efficient specialist.  See Amicus Br. at 10–14.

Third, Suture Express points to Professor Elhauge's analysis under the

- 24 -

discount attribution test as demonstrating coercion and therefore market power. Aplt. Br. at 48–50. Under this test, the full amount of the bundled discount is allocated to the tied product, and if the resulting price of that product is below the defendant's incremental cost to produce it, then the bundle is possibly coercive. See PeaceHealth, 515 F.3d at 909–10. Here, Professor Elhauge concluded that "77% of [Cardinal's and O&M's] customers with bundled penalties had incremental prices on Suture/Endo that were below cost." 6 J.A. 1009.

We have problems accepting that these arguments reveal significantly probative evidence by which a jury could find that Cardinal or O&M has enjoyed market power. For instance, Suture Express's contention that the acceptance of the package by 56–64% of the suture-endo market, though certainly evidence to consider, is ultimately unavailing. As the Supreme Court has explained, "this approach depends on the absence of other explanations for the willingness of buyers to purchase the package." Fortner II, 429 U.S. at 618 n.10. And here, other explanations abound — such as the fact that many of the acute care purchasers simply preferred consolidating their purchases and having fewer distributors to deal with. See Suture Express, 2016 WL 1377342, at *7–8 (providing examples of why hospitals switched between med-surg providers); 10 J.A. 1746 n.34 (deposition testimony of customers switching to broadline distributors for consolidation reasons); see also It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 688 (4th Cir. 2016) ("[T]he productive synergies created when

sellers package complementary products . . . obviously saves distribution and consumer transaction costs." (internal quotation marks and citation omitted)).

Additionally, that Suture Express and Cardinal / O&M charged different prices does not itself show power over price. To do that, one would have to look at the costs borne by each defendant and its margins. And since the entire reason that Suture Express's business model works is that it is able to distribute suture-endo alone at a lower cost than Cardinal and O&M can distribute other-med-surg and suture-endo together, it is logical that Cardinal's and O&M's costs would be higher. That is not a result of market power, but of different distribution models.

Nor does one have to accept the theoretical position that bundle-to-bundle competition necessarily creates a competitive market to conclude that there is sufficient evidence here of actual competition that precludes a finding of market exclusion. Medline has more than doubled its med-surg sales between 2008 and 2014. Regional distributors have likewise grown. And all three parties compete with and have won and lost contracts to these other distributors. A market in which competitors are growing and margins are shrinking is inconsistent with the claim that Cardinal and O&M can exclude competition and control prices.

As for the discount attribution test, the district court found that there existed a genuine issue of fact regarding the conditioning element, and we do not disagree with that assessment. But it is this element, not market power, to which the discount attribution test would be applicable. And this is only if the test can

properly be used to show coercion by a non-monopolist, a proposition for which we can find no support in the caselaw. Cf. Collins Inkjet Corp. v. Eastman Kodak Co., 781 F.3d 264, 270–74 (6th Cir. 2015) (applying test in Section 1 tying claim as "standard for coercion" to defendant with a 100% market share); PeaceHealth, 515 F.3d at 906 (applying test to near-monopolist in Section 2 attempted monopolization claim); X Areeda & Hovenkamp, supra, ¶ 1758a (describing discount attribution test as more effective than the buyer behavior test because the latter "does not measure coercion"). Though market power and coercion are of course related, that there is a factual dispute about one does not itself raise a dispute about the other.

In sum, we do not think a reasonable jury could conclude that either Cardinal or O&M possesses market power sufficient to force the tie. Even if there were a genuine issue as to market power, however, or even if a showing of market power were not required under the rule of reason, we do not think Suture Express has carried its burden of showing antitrust injury.

*2.      Antitrust Injury*

As part of any claim under Section 1 of the Sherman Act, the plaintiff must establish "an injury of the type the antitrust laws were intended to prevent." Cohlmia v. St. John Med. Ctr., 693 F.3d 1269, 1280 (10th Cir. 2012) (citation omitted). This means that the plaintiff must show the challenged restraint actually injured competition, not merely a competitor. SCFC ILC, Inc. v. Visa

USA, Inc., 36 F.3d 958, 965 (10th Cir. 1994); see also Law, 134 F.3d at 1017.

Suture Express contends that Cardinal's and O&M's anticompetitive behavior did just this. As evidence that it was the suture-endo market as a whole that was harmed, Suture Express offers the report of its expert witness, who examined the contract terms for a number of the largest hospital systems serviced by Cardinal and O&M. Sales under these contracts comprised roughly half of all the other-med-surg sold by the two companies. See 2 J.A. 361–94.[8] Professor Elhauge concluded that from 2007 to 2012, between 59% and 79% of suture-endo sales Cardinal made to acute care customers were under contracts that made pricing of other-med-surg contingent in some way on the purchase of suture-endo. Id. at 417. For O&M, those percentages ranged from 95% to 97%. Id. Multiplying these percentages by each company's share of the suture-endo market, Professor Elhauge calculated that Cardinal's bundling arrangements restrained between 18-22%, and O&M's between 38-42%, of the suture-endo market. Thus, according to Suture Express, 56-64% of the suture-endo market was restrained by their contracts from purchasing suture-endo from Suture Express. Aplt. Br. at 36. These foreclosed customers ended up paying $36 million more for suture-endo than they would have had they bought from Suture

----

[8] Professor Elhauge explained that he could not examine 100% of Cardinal's and O&M's contracts because of the arduousness of the task (there were thousands of individual contracts) and because neither defendant produced all of the agreements. 2 J.A. 362, 380–81.

Express.  Id. at 19–20; 2 J.A. 420–21.

This, Suture Express says, is the crux of the antitrust harm inquiry, which it frames as "whether, in the but-for world without the challenged conduct, buyers would have paid less than they paid in the actual world with the conduct."  Aplt. Br. at 38.  The answer, it provides, is yes: "Absent Defendants' bundling terms, hospitals would have purchased from Suture Express at its lower price."  Id. at 35.

But there is a problem with this conclusion: it fails to note that the "but-for world" existed for almost half the market (since 36–44% of the market was not constrained), yet less than half of that market "purchased from Suture Express at its lower price."  In 2007, Suture Express accounted for only 16% of unrestrained suture-endo sales; that number increased to 41% in 2010, and fell to 24% in 2012. 2 J.A. 414; Aplt. Br. at 18.  We note this not because we think that every unrestrained purchase would need to take advantage of the lower price offered by Suture Express for its harm theory to be viable, but because the formulation as presented raises questions about the "but-for world" it models compared to the real-world market that actually existed — and whether it was really competition that was harmed instead of simply one competitor.[9]

---

[9]  Suture Express points to Fortner I for the proposition that it need only show that "any appreciable number of buyers" is affected, not the entire market. Aplt. Br. at 36 (quoting 394 U.S. at 504).  While (again) not suggesting that Suture Express must demonstrate harm to 100% of the suture-endo market, it is worth pointing out that this discussion by the Supreme Court concerned what

Additionally, as the district court understood, simply comparing the average price and mark-ups between the three competitors fails to show that competition itself was harmed across the market. Suture Express, 2016 WL 1377342, at *27. Again, the record tends to show the opposite: overall med-surg revenues increased between 2007 and 2012, even as increased competition drove Cardinal's and O&M's profit margins down.

Accordingly, we do not think Suture Express has demonstrated substantially adverse effects on competition caused by Cardinal and O&M. What the Supreme Court said in a Section 2 context remains true here: "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993). The evidence in this case — the decrease in markups charged, the consolidation of buyer power, the growth of regional competitors, the success of Medline — reveals a med-surg market that is becoming more, not less, competitive. There is simply not enough probative evidence for a jury to find that Cardinal's or O&M's bundling practices constitute an injury of the kind the antitrust laws are intended to prevent. Since we affirm the district court on

constitutes "sufficient economic power" in the tying market — not what counts as harm to competition in the tied market. See 394 U.S. at 502–04.

- 30 -

this point, we need not continue on to an examination of procompetitive justifications offered to support the bundling practices.

B.     Section 3 of the Clayton Act

Section 3 of the Clayton Act prohibits persons engaging in commerce from making a lease or sale of goods "where the effect of such lease, sale, or contract for sale . . . may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. Although the language differs from that of the Sherman Act, "at least for allegations of unlawful tying arrangements, the required showings under both [acts] are identical." Smith Mach. Co. v. Hesston Corp., 878 F.2d 1290, 1299 (10th Cir. 1989). Because we conclude that its Sherman Act claim should not be reinstated, Suture Express's Clayton Act claim likewise fails. Accordingly, we do not reach Cardinal and O&M's argument that the Clayton Act does not even apply here because Suture Express has challenged their distribution services rather than any actual goods they provide. Aplee. Br. at 60 n.24.

C.     Kansas Restraint of Trade Act

The Kansas Restraint of Trade Act prohibits all agreements or contracts "made with a view or which tend to prevent full and free competition in the . . . sale of articles imported into [Kansas]" and those "designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles." Kan. Stat. Ann. § 50-112. Though the KRTA

was originally enacted in 1897, Kansas courts have recognized that it "remains largely undeveloped." O'Brien v. Leegin Creative Leather Prods., Inc., 277 P.3d 1062, 1068 (Kan. 2012). The Kansas Supreme Court has, however, emphasized that its law is not the same as its federal counterparts. Id.

In the leading case interpreting the KRTA, the plaintiffs alleged vertical and horizontal price-fixing under Kan. Stat. Ann. §§ 50-101 and 51-112. Id. at 1067, 1070. In its analysis, the Kansas Supreme Court explained that the KRTA does not provide for the use of the rule of reason, id. at 1083, but that it still requires a showing of antitrust injury, id. at 1075. Such an injury requirement, the court continued, was adopted "from federal antitrust jurisprudence" and "equates to the Kansas concept of causation, or the requirement that a plaintiff's theory of damages . . . correspond to an economic effect that the statute or case law rule invoked as the basis for liability aims to prevent." Id. (internal quotation marks and citation omitted). Thus, in the case before it, the court held that the plaintiffs had raised a genuine issue of material fact because they had shown "that consumers actually paid prices for [the defendant's] goods inflated by its pricing combinations or arrangements with retailers." Id. at 1078.

Here, as we have noted above, Suture Express has not carried its burden of showing a legally viable antitrust injury "of the type the antitrust laws were intended to prevent." See Cohlmia, 693 F.3d at 1280. We do not think that result changes under the KRTA.

Finally, Suture Express points out that the Kansas statute prohibits not only agreements that actually harm full and free competition, but also acts that are made "with a view or which tend to prevent" such competition. Kan. Stat. Ann. § 50-112. This is true. As the O'Brien court recognized, "a plaintiff [under the KRTA] does not have to show that the arrangement actually succeeds in increasing prices." 277 P.3d at 1075. But Suture Express has not met this burden, either. The documents it cites showing Cardinal's and O&M's internal discussions of the competitive threat Suture Express posed and their need to respond show only that the companies realized they needed to adapt to the changing market in order to compete more effectively. The communications do not raise a genuine issue of material fact about whether Cardinal or O&M intended to prevent full and free competition — only that they themselves wanted to engage in it.

### Conclusion

We AFFIRM the judgment of the district court. Viewing the evidence in the light most favorable to Suture Express, we do not think the company can survive summary judgment under Section 1 of the Sherman Act, Section 3 of the Clayton Act, or the Kansas Restraint of Trade Act. There simply is not enough probative evidence by which a reasonable jury could find that Cardinal's and O&M's bundling arrangement unreasonably restrained trade in violation of

federal or state antitrust law.

Finally, we GRANT the parties' motions to seal the unredacted versions of their briefs and volumes 2–25 of the joint appendix. The common-law right of access to judicial records is "not absolute," and we may seal documents if the public's right of access is outweighed by competing interests. JetAway Aviation, LLC v. Bd. of Cty. Comm'rs, 754 F.3d 824, 826 (10th Cir. 2014). Simply because the judicial records are subject to a protective order in the district court, as they are here, does not mean that we must follow suit; instead, the parties must present "a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." Id. (citation omitted). Cardinal, O&M, and Suture Express have done this. The joint appendix contains confidential documents, financial information, and contracts, the confidential nature of which outweighs the public's right of access.